[Civ. No. 14072. Fourth Dist., Div. One. Mar. 16, 1976.]

PLACENTIA FIRE FIGHTERS, LOCAL 2147,
Plaintiff and Appellant, v.
CITY OF PLACENTIA et al., Defendants and Respondents.

## COUNSEL

Silber, Benezra & Taslitz and Richard J. Silber for Plaintiff and Appellant.

Calvin T. Goforth, St. Sure, Moore, Hoyt & Sizoo, Hoyt & Goforth and Jerry M. Patterson for Defendants and Respondents.

## OPINION

**WHELAN, J.**\*—Placentia Fire Fighters, Local 2147 (Union), plaintiff, has appealed from a judgment denying it relief in its action against City of Placentia (City) and certain of City's officials.

The action was based upon alleged denial by City of Union's bargaining rights under the Meyers-Milias-Brown Act (the Act) (Gov. Code §§ 3500-3509),[1] noncompliance by City with and violation of that

---

\*Retired Associate Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

[1]"It is the purpose of this chapter to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations. It is also the purpose of this chapter to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice

Act, of certain sections of the Labor Code, and of section 1983 of title 42, United States Code Annotated. Injunctive relief was asked against such alleged noncompliance and violations, as well as a judgment for compensatory and punitive damages and attorney's fees.

and be represented by such organizations in their employment relationships with public agencies. Nothing contained herein shall be deemed to supersede the provisions of existing state law and the charters, ordinances, and rules of local public agencies which establish and regulate a merit or civil service system or which provide for other methods of administering employer-employee relations nor is it intended that this chapter be binding upon those public agencies which provide procedures for the administration of employer-employee relations in accordance with the provisions of this chapter. This chapter is intended, instead, to strengthen merit, civil service and other methods of administering employer-employee relations through the establishment of uniform and orderly methods of communication between employees and the public agencies by which they are employed." (Gov. Code, § 3500.)

"(a) 'Employee organization' means any organization which includes employees of a public agency and which has as one of its primary purposes representing such employees in their relations with that public agency.

"(b) 'Recognized employee organization' means an employee organization which has been formally acknowledged by the public agency as an employee organization that represents employees of the public agency.

"(c) Except as otherwise provided in this subdivision 'public agency' means every governmental subdivision, every district, every public and quasi-public corporation, every public agency and public service corporation and every town, city, county, city and county and municipal corporation, whether incorporated or not and whether chartered or not. As used in this chapter, 'public agency' does not mean a school district or a county board of education or a county superintendent of schools or a personnel commission in a school district having a merit system as provided in Chapter 3 (commencing with Section 13580) of Division 10 of the Education Code or the State of California.

"(d) 'Public employee' means any person employed by any public agency, including employees of the fire departments and fire services of the state, counties, cities, cities and counties, districts, and other political subdivisions of the state, excepting those persons elected by popular vote or appointed to office by the Governor of this state.

"(e) 'Mediation' means effort by an impartial third party to assist in reconciling a dispute regarding wages, hours and other terms and conditions of employment between representatives of the public agency and the recognized employee organization or recognized employee organizations through interpretation, suggestion and advice." (Gov. Code, § 3501.)

"Except as otherwise provided by the Legislature, public employees shall have the right to form, join, and participate in the activities of employee organizations of their own choosing for the purpose of representation on all matters of employer-employee relations. Public employees also shall have the right to refuse to join or participate in the activities of employee organizations and shall have the right to represent themselves individually in their employment relations with the public agency." (Gov. Code, § 3502.)

"Recognized employee organizations shall have the right to represent their members in their employment relations with public agencies. Employee organizations may establish reasonable restrictions regarding who may join and may make reasonable provisions for the dismissal of individuals from membership. Nothing in this section shall prohibit any employee from appearing in his own behalf in his employment relations with the public agency." (Gov. Code, § 3503.)

"The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation

Judgment was entered September 14, 1973, followed by a notice of appeal.

On September 25, 1973, bargaining representatives of City and Union executed a memorandum of understanding provided for in Government Code section 3505.1 covering the wages, hours and working conditions for the period October 1, 1973 to June 30, 1976.

Following the enactment of the Act, City, in July 1971, adopted resolution 71-R-153 declaring a policy governing employer-employee

---

shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order." (Gov. Code, § 3504.)

"Except in cases of emergency as provided in this section, the governing body of a public agency, and boards and commissions designated by law or by such governing body, shall give reasonable written notice to each recognized employee organization affected of any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted by the governing body or such boards and commissions and shall give such recognized employee organization the opportunity to meet with the governing body or such boards and commissions.

"In cases of emergency when the governing body or such boards and commissions determine that an ordinance, rule, resolution or regulation must be adopted immediately without prior notice or meeting with a recognized employee organization, the governing body or such boards and commissions shall provide such notice and opportunity to meet at the earliest practicable time following the adoption of such ordinance, rule, resolution, or regulation." (Gov. Code, § 3504.5.)

"The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501, and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action.

" 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent." (Gov. Code, § 3505.)

"If agreement is reached by the representatives of the public agency and a recognized employee organization or recognized employee organizations, they shall jointly prepare a written memorandum of such understanding, which shall not be binding, and present it to the governing body or its statutory representative for determination." (Gov. Code, § 3505.1.)

"If after a reasonable period of time, representatives of the public agency and the recognized employee organization fail to reach agreement, the public agency and the recognized employee organization or recognized employee organizations together may agree upon the appointment of a mediator mutually agreeable to the parties. Costs of

relations under the Act. Section 5 of the resolution defined City rights as follows: "The rights of the City include, but are not limited to, the exclusive right to . . . set standards of service; *determine the procedures*

mediation shall be divided one-half to the public agency and one-half to the recognized employee organization or recognized employee organizations." (Gov. Code, § 3505.2.)

"Public agencies shall allow a reasonable number of public agency employee representatives of recognized employee organizations reasonable time off without loss of compensation or other benefits when formally meeting and conferring with representatives of the public agency on matters within the scope of representation." (Gov. Code, § 3505.3.)

"Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502." (Gov. Code, § 3506.)

"A public agency may adopt reasonable rules and regulations after consultation in good faith with representatives of an employee organization or organizations for the administration of employer-employee relations under this chapter (commencing with Section 3500).

"Such rules and regulations may include provisions for (a) verifying that an organization does in fact represent employees of the public agency (b) verifying the official status of employee organization officers and representatives (c) recognition of employee organizations (d) exclusive recognition of employee organizations formally recognized pursuant to a vote of the employees of the agency or an appropriate unit thereof, subject to the right of an employee to represent himself as provided in Section 3502 (e) additional procedures for the resolution of disputes involving wages, hours and other terms and conditions of employment (f) access of employee organization officers and representatives to work locations (g) use of official bulletin boards and other means of communication by employee organization (h) furnishing nonconfidential information pertaining to employment relations to employee organizations (i) such other matters as are necessary to carry out the purposes of this chapter.

"Exclusive recognition of employee organizations formally recognized as majority representatives pursuant to a vote of the employees may be revoked by a majority vote of the employees only after a period of not less than 12 months following the date of such recognition.

"No public agency shall unreasonably withhold recognition of employee organizations." (Gov. Code, § 3507.)

"In the absence of local procedures for resolving disputes on the appropriateness of a unit of representation, upon the request of any of the parties, the dispute shall be submitted to the Division of Conciliation of the Department of Industrial Relations for mediation or for recommendation for resolving the dispute." (Gov. Code, § 3507.1.)

"Professional employees shall not be denied the right to be represented separately from nonprofessional employees by a professional employee organization consisting of such professional employees. In the event of a dispute on the appropriateness of a unit of representation for professional employees, upon request of any of the parties, the dispute shall be submitted to the Division of Conciliation of the Department of Industrial Relations for mediation or for recommendation for resolving the dispute.

" 'Professional employees,' for the purposes of this section, means employees engaged in work requiring specialized knowledge and skills attained through completion of a recognized course of instruction, including, but not limited to, attorneys, physicians, registered nurses, engineers, architects, teachers, and the various types of physical, chemical, and biological scientists." (Gov. Code, § 3507.3.)

"In addition to those rules and regulations a public agency may adopt pursuant to and in the same manner as in Section 3507, any such agency may adopt reasonable rules and regulations providing for designation of the management and confidential employees of

*and standards of selection for employment and promotion;* direct its employees; take disciplinary action; relieve its employees from duty because of lack of work or for other legitimate reasons, maintain the efficiency of governmental operations; determine the methods, means and personnel by which government operations are to be conducted; *determine the content of job classifications;* take all necessary actions to carry out its mission in emergencies; and exercise complete control and discretion over its organization and the technology of performing its work." [Italics ours.]

Elsewhere the resolution provided: "In the establishment of appropriate units . . . (2) management and confidential employees shall not be included in the same unit with non-management or non-confidential employees."

Section 6 of the resolution provided:

"(A) The City, through its representatives, shall meet and confer in good faith with representatives of formally recognized employee organizations with majority representation rights regarding *matters within the scope of representation including wages, hours and other terms and conditions of employment* within the appropriate unit.

---

the public agency and restricting such employees from representing any employee organization, which represents other employees of the public agency, on matters within the scope of representation. Except as specifically provided otherwise in this chapter, this section does not otherwise limit the right of employees to be members of and to hold office in an employee organization." (Gov. Code, § 3507.5.)

"The governing body of a public agency may, in accordance with reasonable standards, designate positions or classes of positions which have duties consisting primarily of the enforcement of state laws or local ordinances, and may by resolution or ordinance adopted after a public hearing, limit or prohibit the right of employees in such positions or classes of positions to form, join or participate in employee organizations where it is in the public interest to do so; however, the governing body may not prohibit the right of its employees who are full-time 'peace officers' as that term is defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 of the Penal Code, to join or participate in employee organizations which are composed solely of such peace officers, which concern themselves solely and exclusively with the wages, hours, working conditions, welfare programs, and advancement of the academic and vocational training in furtherance of the police profession, and which are not subordinate to any other organization.

"The right of employees to form, join and participate in the activities of employee organizations shall not be restricted by a public agency on any grounds other than those set forth in this section." (Gov. Code, § 3508.)

"The enactment of this chapter shall not be construed as making the provisions of Section 923 of the Labor Code applicable to public employees." (Gov. Code, § 3509.)

"(B) The City shall not be required to meet and confer in good faith on any subject preempted by Federal or State law or by the City Charter, *nor shall it be required to meet and confer in good faith on* Employee or *City Rights as defined in Sections* 4 and 5. Proposed amendments to this Resolution are excluded from the scope of meeting and conferring." [Italics ours.]

Following the adoption of resolution 71-R-153, City entered into a memorandum of understanding covering a period ending October 1, 1972, with Placentia City Employees Association (PCEA), which then was the bargaining unit for fire department personnel.

By May 8, 1972, Union was in a position to and did request City to recognize it as the representative of all fire department employees below the rank of fire chief. On August 9, 1972, City formally recognized Union. In a letter of that date Union was told it would represent (1) firemen and (2) fire captains (suppression). Two fire captains (Edwards and Mosley) were classed as "Fire Captains (Administrative)" and were not included in the Unit at that time; all fire captains had been grouped together in the memorandum with PCEA. On August 31 Union objected to the exclusion of those two fire captains, saying they must be included or be promoted to battalion chief, a management position.

A series of meet and confer sessions began September 22, 1972. At the first meeting both sides agreed that agreement on any individual item would be contingent on each side's accepting the total bargaining package.

Sixteen other meetings were held between representatives of City and Union, the last on January 24, 1973, at which time City made its last offer, for acceptance by 5 p.m. January 29. On January 25 City sent a letter and copy of the final offer to each member of the fire department. That letter asked for a second membership vote and ended with the following: "I must emphasize again that this is the final offer, which, if not accepted, will be withdrawn. The City Council, at its last session indicated that it may take a position against paying retroactive pay in the future."

During the course of those negotiations City receded from certain of the positions it had taken earlier, conditioned of course on the agreed-upon principle that binding agreement would result only from an overall settlement of all issues.

One point on which City did not yield was its wish to change to a 40-hour work-week, with three shifts of eight hours per day.

At the city council meeting on January 29, a status report was presented on the negotiations with Union. The next day City declared an impasse, saying "The disputed issue is the eight hour work day, forty hour work week upon which all other segments of the City of Placentia Proposed Memorandum of Understanding is conditioned." During the month of February two impasse meetings were held. No agreement having been reached on February 26, impasse procedures were discussed. At that point City and Union had conditionally agreed upon the following: recognition, union rights, grievance procedures, probation, policy of no discrimination, retirement, life insurance, clothing allowance, payroll deductions, rules and regulations, and compensation for departmental meetings. Items still in dispute included: management rights, educational incentive program, overtime pay, work schedule, no strikes or slowdowns and no lockout, designation of work assignments; conduct of meet and confer sessions, implementation of the memorandum, and duration of the memorandum.

After City had declared an impasse on January 30, the city council, on February 20, gave Captains Edwards and Mosley an 8.1 percent pay raise retroactive from October 1, 1972.

On February 28, 1973, the Mayor sent the following letter to each resident of Placentia:

"I am sending this letter to each City resident at the request of the entire City Council because of concerns expressed by you and your neighbors. Wage and fringe benefit negotiations with Local 2147 of the Firefighters Union have continued for months without settlement. The Union has delivered leaflets door to door, made unsupported accusations, and attempted to frighten the public in their efforts to force your City Council to bow to their demands. Your Councilmen reside within the City, pay taxes, and will not permit a reduction in our fire protection. The City seeks to maintain and improve the present level of emergency and fire protection by increasing the number of on duty fire personnel.

"Your safety is our paramount concern. To this end your City Council has taken steps to insure that fire protection will never be interrupted. Under existing Mutual Aid Agreements surrounding communities are available to provide emergency assistance. The number of volunteer fire

personnel has been increased and in addition to fire vehicles, police units are being equipped with resuscitators to enable a more immediate response to breathing difficulties.

"Criticism by the Union is a smoke screen to hide the real issue—the work week. The City Council proposes that the work week for fire personnel be reduced from 67 hours per week (based on 24 hour shifts) to a 40 hour work week (based on 5 eight hour shifts). You may rightfully question why a 27 hour reduction in hours would be so bitterly opposed by the Union, especially when this places fire personnel on an equal status with the remainder of public employees who have been working a 40 hour work week for years. The City proposes 5 fully productive eight hour shifts per week. This will eliminate sleeping on the job, remove beds, televisions, kitchens, and recreational facilities from fire stations. We are simply seeking an honest days work in return for the establishment of a standard work week. The City proposes increased salaries equivalent to other local communities. The City proposal also guarantees an increased number of fire personnel on duty who are awake, clothed, and ready to respond to any emergency calls.

"City Councilmen, as your elected representatives, have the responsibility of constantly reviewing fire protection to improve service at a cost that the taxpayer can afford. Our record of reducing the property tax rate during the past two years has been criticized by Union representatives who want a larger share of your tax dollar. In these days of rising taxes, decisions about tax increases must remain in the hands of your elected officials and not be handed over to employee organizations or any third parties.

"The purpose of this letter is to advise you of our position and seek your support in our efforts to prevent raising costs beyond what we, your elected representatives, feel is fair."

At a meeting of the city council on March 6, 1973, resolution 73-R-120 was adopted, which reduced the work-week to forty hours, increased wages and benefits, and instituted a three-shift, eight-hour work-day. On March 20, Union wrote City asking it to postpone implementation of the 40-hour work-week. City refused and firemen were notified on April 2 that the new work-day would begin April 8. City was advised by Union that its members would not comply. The following memorandum, dated April 4, was sent to all fire department personnel:

"The City Council has instructed this office to implement the 8-hour per day work schedule, and recent efforts have been directed toward this implementation.

"Your Union has advised us today that it will not comply with the 8-hour work schedule set to go into effect on Sunday, April 8, 1973. This is to inform you that failure to comply with the orders of the Chief of the Fire Department is insubordination, and may result in discipline up to and including discharge.

"Every effort is being made to relieve any hardship that this changeover may entail, and it is expected that all employees of the Placentia Fire Department will cooperate with the Fire Chief's orders."

On the agenda of the city council meeting of March 6 was "Status Report regarding City Negotiations with International Association of Fire Fighters." The minutes of that meeting show that the city council was told the parties had reached an impasse and there were four options open: do nothing, use a conciliator, use an arbitrator, let the city council decide. A resolution containing those items which the city council could consider was presented for adoption, comments by the public were heard, and the item was passed by a unanimous voice vote. No written notice that City would consider this resolution was given to Union, as called for by Government Code section 3504.5 and by resolution 71-R-153, section 8 of which states: "Reasonable written notice shall be given to each recognized employee organization affected of (*sic*) any ordinance, rule, resolution or regulation directly relating to matters within the scope of representation proposed to be adopted by the City Council or by any board or commission of the City, and each shall be given the opportunity to meet with such body prior to adoption."

City's attorney earlier in the meeting had informed the council it could not consider items that required Union agreement.

Union knew there was a meeting on March 6. In its letter of February 20, Union had asked for a " 'hearing on the merits of the dispute,' during the Council meeting of March 6, 1973 . . . for the *sole* purpose of determining an appropriate 'impartial' impasse procedure." City's attorney said he would present Union's request and recommend a determination by the council of the issues in the dispute. The agenda for the March 6 meeting called for a "status report" on the labor negotiations,

but did not include any reference to this item under "hearings." Union had presented its position to the council on the 40-hour work-week at a meeting on February 20, 1973. Union members and officials were present at the March 6 meeting. In introducing the subject, City's attorney made reference to the adoption of a resolution dealing with all issues not requiring Union agreement. Following this presentation there was extensive discussion on the merits of the issues by Union members, interested citizens and council members. Anyone who wished to speak was recognized. No one objected when a councilman moved to adopt the resolution.

Union contends City did not meet and confer in good faith.

Union argues the initial exclusion from the bargaining unit of the two nonunion fire captains, who were designated as "Fire Captains (Administrative)" was a violation of the Act's requirement that an "appropriate unit" be designated (Gov. Code, § 3507); and, further, that this action constituted discrimination against Union[2] and was evidence of bad faith.

Union maintains that giving the two "administrative" fire captains an 8.1 percent pay increase retroactive to October 1, 1972, was a unilateral wage increase made during the course of negotiations, and as such represented a per se violation of the duty to "meet and confer in good faith" under Government Code section 3505. Additionally, if that action was improper it would constitute discrimination on the basis of Union membership proscribed by Government Code section 3506.

Union says the letter sent to each member of the fire department January 25, 1973, by City was an attempt to negotiate directly with Union members and therefore constituted a violation of the duty to meet and confer in good faith.

On January 12, 1973, Union members, by secret ballot, had rejected a package similar to City's final offer.

The definition by City of management rights in resolution 71-R-153, and their recognition in the to-be-bargained-for agreement, are cited as evidence of bad faith, specifically with regard to the determination of work assignments of firemen and fire captains.

[2]Government Code section 3506 reads: "Public agencies and employee organizations shall not interfere with, intimidate, restrain, coerce or discriminate against public employees because of their exercise of their rights under Section 3502."

City's proposals to eliminate educational incentive pay are said to be evidence of bad faith, as are its proposals for a nonstrike, nonlockout, nonpicketing clause.

City's regulations, embodied in resolution 71-R-153, are said to be unreasonable in the provision for exclusive power of the municipal relations officer to make unit determinations; and in the provision for the council's making the impasse decision on the merits.

Several things are apparent from the Act:

Agreement between the public agency and its employees is to be sought as the result of meetings and conferences held in good faith for the purpose of achieving agreement if possible; but agreement is not mandated. It follows that government is not required to cease operations because agreement has not been reached.

There is to be only one employee representative of a unit; but a member of that unit is not required to join the representative group and may bargain directly with the public agency.

In the event of a failure to reach agreement after good faith efforts over a reasonable time to do so, the parties may agree to place the disputed matters in the hands of a mediator, but are not required to do so.

█ Union, in attacking the trial court's finding that City met and conferred in good faith, contends in substance that the evidence shows as a matter of law City did not meet and confer in good faith. Prominent in that contention is the argument City's position on the 40-hour work-week could not be maintained in good faith. No attempt is made to show why that position could not be maintained in good faith any less than one of the alternatives adhered to by Union.

City's position does not appear to be unreasonable. In *Fire Fighters Union* v. *City of Vallejo,* 12 Cal.3d 608 [116 Cal.Rptr. 507, 526 P.2d 971], one of the alternatives proposed by the firefighters was a 40-hour work-week.

In the case at bench City did not take the position that consideration of the structure of the work-week was the exclusive function of City. A

reasonable case can be made for the forty-hour work-week of five eight-hour days. The firm adherence to such a work-week based upon such reasons is not inevitably a demonstration of bad faith.

In a case involving a city charter provision for mandatory arbitration of unresolved issues in city employer-employee negotiations (*Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608, 617) it was said: "[T]he bargaining requirements of the National Labor Relations Act and cases interpreting them may properly be referred to for such enlightenment as they may render in our interpretation of the scope of bargaining under the Vallejo charter."

The same may be said of federal law and decisions when helpful in application of the Act where its provisions are similar to those of the National Labor Relations Act.

As related to the question of good faith, City's continued insistence on the 40-hour work-week, which is not essentially unreasonable, is justified by the authorities.

The court in *N.L.R.B.* v. *General Electric Company,* 418 F.2d 736, 762, defines the nature of the task of assessing "good faith": "These are not simple tests; they will not be resolved by formular incantations. Sadly, neither will they be so precise that one will always know the exact limits of what is allowed, and what forbidden—but this is a problem hardly unknown in the law or to judges. The difficulty here, however, arises out of the herculean task of legislating a state of mind. Congress has ordered the Board—and this court—to effectuate its policy of encouraging good faith bargaining, and not to avoid it because the mandate is difficult to apply."

The National Labor Relations Act defines the duty to bargain: "[T]o bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment . . . *but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . .*" (29 U.S.C.A. § 158(d).) [Italics ours.]

The "right to remain firm" is thus established as the corollary to the duty to bargain in good faith. No mandatory duty to agree is imposed by

the Meyers-Milias-Brown Act and the "right to remain firm" has been implicitly recognized (*Los Angeles County Employees Assn., Local 660* v. *County of Los Angeles,* 33 Cal.App.3d 1, 7 [108 Cal.Rptr. 625]).

The court in *N.L.R.B.* v. *Herman Sausage Co.,* 275 F.2d 229, 231-232, elaborates on the interplay between "good faith" and genuine firmness:

"[T]he employer may have either good or bad reasons, or no reason at all, for insistence on the inclusion or exclusion of a proposed contract term. If the insistence is genuinely and sincerely held, if it is not mere window dressing, it may be maintained forever though it produce a stalemate...

"The obligation of the employer to bargain in good faith does not require the yielding of positions fairly maintained....

"On the other hand while the employer is assured these valuable rights, he may not use them as a cloak. In approaching it from this vantage, one must recognize as well that bad faith is prohibited though done with sophistication and finesse. Consequently, to sit at a bargaining table, or to sit almost forever, or to make concessions here and there, could be the very means by which to conceal a purposeful strategy to make bargaining futile or fail. Hence, we have said in more colorful language it takes more than mere 'surface bargaining,' or 'shadow boxing to a draw,' or 'giving the Union a runaround while purporting to be meeting with the Union for purpose of collective bargaining.' "

■ Bad faith on the part of City in meeting and conferring cannot be found in the provisions of resolution 71-R-153. That resolution presumably was adopted after "consultation in good faith with representatives of an employee organization or organizations for the administration of employer-employee relations" as provided in section 3507 of the Act; its provisions cannot be adduced as bad faith in subsequent negotiations merely because Union may not have participated in the consultations preparatory to adoption of the resolution.

In any event, the acceptance by City of certain proposals by Union in the impasse conferences depart from a strict adherence to the resolution's definition of City rights, notably as to "the procedures and standards of selection for employment and promotion," and as to City's right to "determine the content of job classifications." We refer to City's

willingness to have all "Fire Captains" included in the bargaining unit; its agreement as to probationary employment, a grievance procedure to include advisory arbitration; and an employment policy of no discrimination.

City's original demand for a three-year contract did not show bad faith, even though the preceding contract with another group was for one year. The fact Union later made a three-year contract seems to negate bad faith on the part of City, as does the fact City in the impasse offer made by it was willing to make the contract for one year.

City's original recognition of Union excluded two administrative fire captains from the bargaining unit. City's stated position was and is that the administrative captains had administrative duties.

The Supreme Court in *Fire Fighters Union v. City of Vallejo, supra,* 12 Cal.3d 608, 618, stated: "The city contends that this proposal may not apply to appointment or promotion to the position of deputy fire chief. Although the Vallejo charter does not contain any provision for determining the proper bargaining unit, supervisory or managerial employees are routinely excluded from the bargaining units under the National Labor Relations Act. [Citations.] [B]y analogy, we conclude that under the charter the union can claim no right to bargain as to supervisory positions."

Nevertheless, City has not been unwilling to bargain as to the inclusion of the administrative captains within the bargaining unit. Those men were Edwards and Mosley. Those men were not members of Union, but had not been separately classified in the memorandum of understanding with the PCEA. Union, in the negotiations, contended those two captains should be included in the bargaining unit. City was willing in December 1972 to agree to that as a condition of an overall agreement that was not reached.

That was not necessarily a concession that City's earlier position was unreasonable that the two men should not be included in the unit because they were administrative employees. There is a recognized distinction between the horizontal union and the vertical union. Union here took the position only a horizontal union was acceptable. A contrary position was not essentially unreasonable.

On that basis no unlawful discrimination was shown when City, after the breakdown of negotiations, gave the administrative captains a retroactive pay raise; they were not then members of Union, were not within the bargaining unit as then established, were free under the Act to deal directly with City, and for all that appears may have been entitled to separate treatment by reason of their duties. Similar raises were later given to the other captains.

City's demand for a no-strikes, no-slowdowns, no-lockouts provision, even without an arbitration agreement, was not necessarily evidence of bad faith.

Without continuing to detail each of the other separate matters which are said by Union to show City's bad faith, we note that as to some of those based upon specific conduct of individuals rather than bargaining demands there was a conflict in the evidence; as to others permissible inferences negated bad faith; as to all no relationship was shown between the individual whose conduct was in question and the bargaining officer of City. We find the trial court's finding that City did meet and confer in good faith to be supported by the evidence.

The Act provides that public agencies shall "meet and confer in good faith regarding wages, hours, and other terms and conditions of employment . . ." (Gov. Code, § 3505.) This duty includes negotiating on subjects within the scope of bargaining, and carrying on the meet and confer sessions in a manner labeled "good faith."

The question of good or bad faith is primarily a factual determination based on the totality of the circumstances (see, e.g., *Labor Board* v. *Insurance Agents,* 361 U.S. 477, 498 [4 L.Ed.2d 454, 469, 80 S.Ct. 419, 432]; *N.L.R.B.* v. *General Electric Company, supra,* 418 F.2d 736, 756) and therefore on appeal the trial court's finding must be upheld if it is supported by the record as a whole. (NLRB decisions are similarly treated on review.) (*N.L.R.B.* v. *Herman Sausage Co., supra,* 275 F.2d 229, 231.)

In general, good faith is a subjective attitude and requires a genuine desire to reach agreement (*N.L.R.B.* v. *MacMillan Ring-Free Oil Co.,* 394 F.2d 26; *N.L.R.B.* v. *Mrs. Fay's Pies,* 341 F.2d 489). The parties must make a serious attempt to resolve differences and reach a common ground (*Labor Board* v. *Insurance Agents, supra,* 361 U.S. 477, 485 [4 L.Ed.2d 454, 461-462, 80 S.Ct. 419, 425]). The effort required is

inconsistent with a "predetermined resolve not to budge from an initial position." (*Labor Board* v. *Truitt Mfg. Co.,* 351 U.S. 149, 154 [100 L.Ed. 1027, 1032-1033, 76 S.Ct. 753, 757]—conc. opn.; *N.L.R.B.* v. *General Electric Company, supra,* 418 F.2d 736, 762.)

The court's findings were adequate and covered all questions of fact as to which Union requested findings and could properly request specific findings.

Code of Civil Procedure section 632 provides in part: "Where findings are required, they shall fairly disclose the court's determination of all issues of fact in the case. . . ." [Added by amendment in 1968.]

Code of Civil Procedure section 634 reads as follows: "When written findings and conclusions are required, and the court has not made findings as to all facts necessary to support the judgment or a finding on a material issue of fact is ambiguous or conflicting, and the record shows that such omission, ambiguity or conflict was brought to the attention of the trial court . . . it shall not be inferred on appeal . . . that the trial court found in favor of the prevailing party as to such facts or on such issue." [Significantly amended in 1959.]

In *Morris* v. *Thogmartin,* 29 Cal.App.3d 922, 928-929 [105 Cal.Rptr. 919], the court discusses the purpose and scope of the several amendments to the Civil Code sections on the requirements of findings and reviews the cases construing the statutes. Among the material cited the following from *Ball* v. *American Trial Lawyers Assn.,* 14 Cal.App.3d 289, 307 [92 Cal.Rptr. 228], is relevant in this instance: " 'Whether a finding be in terms of a finding of an ultimate fact or whether it be a mislabeling of a conclusion of law, in face of a request for findings of specific facts under Code of Civil Procedure section 634, a finding may be inadequate. The purpose of section 634 "was to discourage the mere finding of so-called ultimate facts when such method left counsel and the appellate court unable to determine the trial court's resolution of the conflicting facts needed for a factual determination of the case. The purpose of the amendment was to compel the trial judge, when requested, to make findings on specified material issues of fact." [Citations.] A finding on a subsidiary fact probative of the ultimate fact can be material. "The findings of probative facts can be used to overcome an express finding of the ultimate fact found, or [*sic*] where it appears that the trial court made the alleged finding of ultimate fact simply as a conclusion from the

particular facts found." [Citation.] The findings of fact must be definite and certain so that the defeated party may show how or in what manner the findings made are unsupported by the evidence. [Citations.]' " (29 Cal.App.3d 922, 928-929.)

■ However, the court has no duty to make findings as to every matter on which evidence is received at trial (see *Coleman Engineering Co.* v. *North American Aviation, Inc.,* 65 Cal.2d 396, 410 [55 Cal.Rptr. 1, 420 P.2d 713]; *Kanner* v. *Globe Bottling Co.,* 273 Cal.App.2d 559, 568 [78 Cal.Rptr. 25]).

" 'Failure to make definite findings on factual issues presented by pleadings, particularly where there is substantial evidence which would have sustained a finding for the appealing party, requires a reversal.' " (*Morris* v. *Thogmartin,* 29 Cal.App.3d 922, 928 [105 Cal.Rptr. 919], quoting *Hine* v. *Carmichael,* 205 Cal.App.2d 663, 666 [23 Cal.Rptr. 331].)

But the court has also concluded: "[I]f findings are made upon issues which determine the cause and uphold the judgment, other issues become immaterial and a failure to find thereon does not constitute prejudicial error." (*Santoro* v. *Carbone,* 22 Cal.App.3d 721, 730 [99 Cal.Rptr. 488].)

The court was not required to incorporate findings of fact proposed by Union which were contrary to or inconsistent with findings which the court did make.

Union has not shown any right to relief based upon the claimed deprivation of "rights, privileges or immunities secured by the Constitution and laws." The trial court's holding on that issue was proper. That extends to the actions of the city council after the impasse negotiations had failed to reach an overall agreement.

It is not clear whether the trial court's conclusion of law that "[t]he suitability of the eight hour day work schedule is a question of policy within the exclusive province of the City Council and will not be considered or decided by the Court" referred only to the specific action taken by the city council at the meeting of March 6, 1973, or was intended as a general proposition that the question of the length of a work-day for firemen was not within the scope of bargaining under the Act. If the latter was intended, which seems unlikely, in view of the

specific language of the Act and the reasoning of *Fire Fighters Union* v. *City of Vallejo, supra,* 12 Cal.3d 608, 617, the trial court was in error.

If the trial court meant that City was not powerless after the breakdown of negotiations to carry on the business of government in fixing hours of employment that were not unreasonable, then the trial court's conclusion was proper.

We are not prepared to lay down a blueprint for the future guidance of the parties.

The judgment is affirmed.

Brown (Gerald), P. J., and Cologne, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied May 26, 1976.