5 Cal.Rptr.3d 326 (2003)
112 Cal.App.4th 639
CLAREMONT POLICE OFFICERS ASSOCIATION, Plaintiff and Appellant,
v.
CITY OF CLAREMONT et al., Defendants and Respondents.
No. B163219.
Court of Appeal, Second District, Division Three.
October 9, 2003.
Review Granted January 14, 2004.
*328 Lackie & Dammeier, Dieter C. Dammeier and Michael A. Morguess for Plaintiff and Appellant.
Liebert Cassidy Whitmore, Richard M. Kreisler, Los Angeles, and Mark H. Meyerhoff, San Pedro, for Defendants and Respondents.
Alan L. Schlosser, Mark Schlosberg; and Peter Eliasberg, Los Angeles, for American Civil Liberties Union of Northern *329 California and ACLU Foundation of Southern California as Amici Curiae on behalf of Defendants and Respondents.
*327 CROSKEY, Acting P.J.
Claremont Police Officers Association (the association) appeals a judgment denying a petition for writ of mandate against the City of Claremont (the city) and its police chief, Roy Brown. The petition challenges the city's adoption of a policy requiring police officers to record information concerning the race and ethnicity of a person subjected to a vehicle stop if the stop does not result in an arrest or citation. The association contends the policy affects the "terms and conditions of employment" (Gov.Code, § 3505)[1] and does not involve "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order" (§ 3504), so the city must meet and confer with the association before adopting the policy. We agree that the city was required to meet and confer, and therefore reverse the judgment with directions to grant the petition.

FACTUAL AND PROCEDURAL BACKGROUND

1. Former Vehicle Stop Program

The city police department implemented a program in May 2000 to record the race of drivers and pedestrians stopped by police officers if the stop did not result in an arrest or citation. Police officers were required to inform the dispatcher by radio of the reason for the stop and the race, age group, and gender of the driver or pedestrian. The purpose of the program, known as the tracking program, was to determine whether officers engaged in racial profiling. The program was in effect through April 2001.

2. Memorandum of Understanding

The city and the association entered into a collective bargaining agreement known as the Memorandum of Understanding (MOU) in July 2000. The MOU governs salary increases, retirement benefits, health insurance, accrual of sick leave and vacation time, grievance procedures, drug and alcohol testing, and other matters. The MOU does not address data collection requirements for vehicle stops or describe the duties for each job classification.
Article XXXI.B. of the MOU states:
"During the term of this Agreement, the parties expressly waive and relinquish the right to meet and confer and agree the parties shall not be obligated to meet and negotiate with respect to any subject matter, whether referred to or covered in this Agreement or not, even though each subject or matter may not have been within the knowledge or contemplation of either or both the City or the Association at the time they met and negotiated on and executed this Agreement, and even though such subjects or matters were proposed and later withdrawn."

3. New Vehicle Stop Policy

The police commission determined that the information gathered through the tracking program was insufficient to determine whether police officers engaged in racial profiling. The commission appointed a subcommittee and an advisory panel to consider the issue. The subcommittee recommended a new data collection program, designated the Vehicle Stop Data Study. The association's president was a member of the advisory panel and objected to some provisions of the proposed new policy. The police commission approved the new policy in February 2002.
*330 The association invoked the Meyers-Milias-Brown Act (§ 3500 et seq.) and asked to meet and confer with the city concerning the policy in April 2002. The city, citing advice of counsel, refused the request.
The police department implemented the policy in July 2002. The policy applies only to vehicle stops that do not result in an arrest or citation. A police officer must check boxes on a written form to indicate the time and date of the stop, age group and gender of the driver, driver's race or ethnicity, officer's perception of the driver's race or ethnicity before the stop, initial reason for the stop, initial reason for any search and type of search conducted, outcome of the stop, driver's city of residence, general location where the infraction occurred, duration of the stop, year of the vehicle, and whether the police vehicle was equipped with a camera. A team of researchers will analyze the data collected. The initial term for data collection and analysis is 15 months, after which the city proposes to reevaluate the merits of the program.

4. Trial Court Proceedings

The association petitioned the superior court for a writ of mandate in July 2002 seeking to compel the city to meet and confer with the association concerning the vehicle stop policy. After a hearing on the merits, the superior court denied the petition. The court concluded in a written ruling that (1) the association did not unreasonably delay its assertion of rights, and the city suffered no prejudice from delay, so the association's claim is not barred by laches or waiver; (2) the vehicle stop policy causes only a minimal workload increase for police officers and does not substantially increase the potential for disciplinary action against an officer, and the cost of the bargaining process would outweigh its value; (3) the policy falls predominantly within the city's management prerogative to determine policy objectives and therefore is not subject to the meet and confer requirement; and (4) since the policy is not subject to the meet and confer requirement, article XXXI.B. of the MOU is inapplicable.

CONTENTIONS
The association contends the vehicle stop policy affects the "terms and conditions of employment" (§ 3505) because the data collected could result in disciplinary action against an officer and because the policy imposes a new work rule, and the policy is not a fundamental policy decision involving "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order" (§ 3504), so the city must meet and confer with the association regarding the policy. The association does not seek to meet and confer concerning the necessity to collect information concerning potential racial profiling, but only seeks to meet and confer concerning the specific requirements of the vehicle stop policy, use of the data collected, and proposed restrictions on dissemination of the data.
The city contends (1) the vehicle stop policy directly affects police-community relations and therefore is within the realm of its managerial discretion; (2) the potential for disciplinary action against an officer based on the data collected is speculative and is not supported by the record; (3) the policy is an insignificant change from the prior tracking program and therefore is not subject to mandatory negotiation; (4) the association expressly waived the right to meet and confer with the city concerning matters within the scope of representation, under article `LB. of the MOU; and (5) the association did not seek to meet and confer with the city promptly after *331 learning that the city had begun to develop the new policy, so the association waived the right to meet and confer and is barred by laches, and the association's participation in the advisory panel through its president also waived the right to meet and confer.

DISCUSSION

1. The Meyers-Milias-Brown Act Meet and Confer Requirement

The Meyers-Milias-Brown Act states that a public agency must notify and offer to meet with a recognized employee organization affected by "any ordinance, rule, resolution, or regulation directly relating to matters within the scope of representation proposed to be adopted...." (§ 3504.5.) Section 3504 states, "The scope of representation shall include all matters relating to employment conditions and employer-employee relations, including, but not limited to, wages, hours, and other terms and conditions of employment, except, however, that the scope of representation shall not include consideration of the merits, necessity, or organization of any service or activity provided by law or executive order."
Section 3505 states that a public agency "shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment" with representatives of recognized employee organizations and "shall consider fully" the representatives' presentations before making a decision.[2]
The purposes of the Meyers-Milias-Brown Act are "to promote full communication between public employers and their employees by providing a reasonable method of resolving disputes regarding wages, hours, and other terms and conditions of employment between public employers and public employee organizations" and "to promote the improvement of personnel management and employer-employee relations within the various public agencies in the State of California by providing a uniform basis for recognizing the right of public employees to join organizations of their own choice and be represented by those organizations in their employment relationships with public agencies." (§ 3500, subd. (a).)
"The duty to meet and confer in good faith has been construed as a duty to bargain with the objective of reaching binding agreements between agencies and employee organizations over the relevant terms and conditions of employment. (Glendale City Employees' Assn., Inc. v. City of Glendale (1975) 15 Cal.3d 328, 336 *332 [124 Cal.Rptr. 513, 540 P.2d 609].) The duty to bargain requires the public agency to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse.... [Citation.]" (Santa Clara County Counsel Attys. Assn. v. Woodside (1994) 7 Cal.4th 525, 537, 28 Cal.Rptr.2d 617, 869 P.2d 1142.) If the parties reach an agreement and enter into a written memorandum of understanding, the memorandum of understanding becomes binding upon its approval by the public agency's governing body. (§ 3505.1; Glendale City Employees' Assn. Inc., supra, at p. 336, 124 Cal.Rptr. 513, 540 P.2d 609.) If the parties fail to reach an agreement, they may submit the matter to mediation. (§ 3505.2)
The Meyers-Milias-Brown Act requires a public agency to meet and confer in good faith and to fully consider the position of the employee organization, but it does not prevent a public agency from implementing proposed changes if the parties fail to reach an agreement. (Placentia Fire Fighters v. City of Placentia (1976) 57 Cal.App.3d 9, 28, 129 Cal.Rptr. 126.)
The duty to meet and confer applies to matters "regarding wages, hours, and other terms and conditions of employment" (§ 3505), but does not extend to "consideration of the merits, necessity, or organization of any service or activity provided by law or executive order" (§ 3504). These statutory phrases require careful construction to ensure that one category does not swallow the other. (Fire Fighters Union v. City of Vallejo (1974) 12 Cal.3d 608, 615, 116 Cal.Rptr. 507, 526 P.2d 971.)
A policy or regulation must have a significant and adverse effect on wages, hours, or other working conditions to fall within the quoted language from section 3505 and therefore be subject to mandatory negotiation. (Building Material & Construction Teamsters' Union v. Farrell (1986) 41 Cal.3d 651, 659, 224 Cal.Rptr. 688, 715 P.2d 648 (Building Material); Riverside Sheriff's Assn. v. County of Riverside (2003) 106 Cal.App.4th 1285, 1290, 131 Cal.Rptr.2d 454.) The purpose of the quoted language from section 3504 is to distinguish matters that significantly affect wages, hours, and other working conditions from "more general managerial policy decisions" over which a public employer retains discretion to act unilaterally. (Fire Fighters Union v. City of Vallejo, supra, 12 Cal.3d at p. 616, 116 Cal.Rptr. 507, 526 P.2d 971; accord, Building Material, supra, at p. 663, 224 Cal.Rptr. 688, 715 P.2d 648; People ex rel. Seal Beach Police Officers Assn. v. City of Seal Beach (1984) 36 Cal.3d 591, 602, 205 Cal.Rptr. 794, 685 P.2d 1145.)
The California Supreme Court in Building Material held that a public employer's elimination of two positions and creation of new positions in another classification represented by a different collective bargaining unit significantly and adversely affected represented employees, and held that the action did not involve a fundamental policy decision. (Building Material, supra, 41 Cal.3d at pp. 659, 663, 224 Cal. Rptr. 688, 715 P.2d 648.) The court distinguished a decision to close a plant or reduce the size of an entire workforce from the decision to transfer work duties to different positions. "Decisions to close a plant or reduce the size of an entire workforce, however, are of a different order from a plan to transfer work duties between various employees. The former directly affect the amount of work that can be accomplished or the nature and extent of the services that can be provided, and are therefore `fundamental management' decisions. The decision to transfer bargaining-unit *333 work to nonunit employees in this case had no effect on the services provided by the hospital, but directly affected the wages, hours, and working conditions of the hospital employees. Thus, the work transfer was a suitable subject for collective bargaining." (Id. at pp. 663-664, 224 Cal.Rptr. 688, 715 P.2d 648.)
The California Supreme Court in Fire Fighters Union v. City of Vallejo, supra, 12 Cal.3d at pages 621, 116 Cal.Rptr. 507, 526 P.2d 971 to 622 concluded that the city's decision to reduce the number of firefighters concerned "the organization of the service," but that the specifics of a plan to implement the layoffs affected the employees' workload and safety and therefore were subject to mandatory bargaining. (Accord, Los Angeles County Civil Service Com. v. Superior Court (1978) 23 Cal.3d 55, 63-64, 151 Cal.Rptr. 547, 588 P.2d 249; State Assn. of Real Property Agents v. State Personnel Bd. (1978) 83 Cal.App.3d 206, 211-213,147 Cal.Rptr. 786.)
A policy or regulation may both significantly affect wages, hours, or other working conditions and constitute "a fundamental managerial or policy decision." (Building Material, supra, 41 Cal.3d at p. 660, 224 Cal.Rptr. 688, 715 P.2d 648.) In those circumstances, the meet and confer requirement is inapplicable unless "the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question. [Citations.]" (Ibid.) "When an employer makes a fundamental management decision that significantly affects the wages, hours, or working conditions of its employees, a balancing test applies: the employer's need for unfettered authority in making decisions that strongly affect a firm's profitability [or mission] is weighed against the benefits to employer-employee relations of bargaining about such decisions. [Citation.]" (Id. at p. 663, 224 Cal.Rptr. 688, 715 P.2d 648.)

2. The Vehicle Stop Policy Significantly Affects the Terms and Conditions of Employment and Is Not a Fundamental Policy Decision

Statutory construction and the application of a statute to undisputed facts are legal questions that we review de novo. (R.P. Richards, Inc. v. Chartered Construction Corp. (2000) 83 Cal.App.4th 146, 153-154, 99 Cal.Rptr.2d 425.)
The decision to undertake measures to guard against both the practice of racial profiling and the public perception that racial profiling occurs is a fundamental policy decision that directly affects the police department's mission to protect and to serve the public. We conclude that the decision precisely how to implement that fundamental policy, however, involves several variables affecting law enforcement officers and is not itself a fundamental policy decision.
We conclude further that the vehicle stop policy significantly affects officers' working conditions, particularly their job security and freedom from disciplinary action, their prospects for promotion, and the officers' relations with the public. Racial profiling is illegal.[3] An officer could be *334 accused of racial profiling and subjected to disciplinary action, denial of promotion, or other adverse action based in part on the information collected under the new policy. For this reason, the manner that the information is collected and the accuracy of the data and data analysis are matters of great concern to the association's members. Moreover, the city's use of a team of researchers from outside of the police department and police commission may create the potential for public dissemination and misuse of data concerning individual officers, which could impair an officer's relations with the public and effectiveness on the job. These potential adverse effects are neither speculative nor remote and need not be demonstrated by historical facts to be considered significant. The vehicle stop policy also is a significant change from the former tracking program, which involved no written report by officers, no outside research team, and fewer required data items. Since the vehicle stop policy significantly affects working conditions and is not a fundamental policy decision, the city was required to meet and confer with the association before implementing the policy.
Berkeley Police Assn. v. City of Berkeley (1977) 76 Cal.App.3d 931, 143 Cal. Rptr. 255 and San Jose Peace Officer's Assn. v. City of San Jose (1978) 78 Cal. App.3d 935, 144 Cal.Rptr. 638, cited by the city, are distinguishable. Berkeley involved the police chiefs decision to allow a member of the police commission to attend hearings conducted by the police department to investigate complaints of officer misconduct, and allow a department representative to attend similar hearings conducted by the commission. (Berkeley, supra, at p. 935, 143 Cal.Rptr. 255.) The Court of Appeal concluded that the new policies "concerning a matter of police-community relations" were "`of such fundamental importance as to the basic direction of the corporate enterprise....' [Citation omitted.]" that they were "fundamental policy decisions." (Id. at p. 937, 143 Cal.Rptr. 255.) The court also concluded that the new policies were consistent with a preexisting regulation authorizing the police chief to order the disclosure of confidential information, and therefore did not constitute a change in working conditions. (Id. at p. 938, 143 Cal.Rptr. 255.) The policies in Berkeley involved no change in an officer's duties. The vehicle stop policy here, in contrast, imposes new duties on officers that may have a significant effect on how their performance is evaluated, and the new duties themselves do not rise to the level of a fundamental policy decision.
San Jose Peace Officer's Assn. v. City of San Jose, supra, 78 Cal.App.3d 935, 144 Cal.Rptr. 638 involved a change in a police department regulation governing the use of force, prohibiting the use of deadly force *335 against a fleeing felon. (Id. at pp. 937-940, 144 Cal.Rptr. 638.) The Court of Appeal concluded that the formulation of a use of force policy involved considerations of fundamental importance to the city, that the policy change affected officers' safety and other working conditions only indirectly, and that a matter of such fundamental importance should be resolved by city officials and should not be subject to collective bargaining. (Id. at pp. 946-949, 144 Cal. Rptr. 638.) The court also noted that the regulation concerning the use of firearms was pursuant to the city's constitutional police power and stated that the city may not bargain away its police power. (Id. at p. 947, 144 Cal.Rptr. 638.) The vehicle stop policy, in contrast, is not a policy decision concerning the use of force, does not directly affect the exercise of the city's police power, and directly affects an officer's job security and working conditions arising from the performance of his or her duties.

3. The MOU Does Not Relieve the City of the Duty to Meet and Confer

A "zipper" clause generally provides that parties to a collective bargaining agreement have no duty to meet and confer concerning matters that were raised or could have been raised in prior negotiations, regardless of whether the agreement expressly addresses those matters. (See, e.g., Los Rios Community College District (1988) PERB Dec. No. 684 [12 PERC ¶ 19112, p. 513]; South San Francisco Unified School District (1983) PERB Dec. No. 343 [7 PERC ¶ 14243, p. 977]; Los Angeles Community College District (1982) PERB Dec. No. 252 [6 PERC ¶ 13241, p. 926].)[4] The purpose of a zipper clause is to prevent either party from requiring the other party to negotiate proposed modifications to the agreement or changes in the status quo during the term of the agreement. (City of Fresno v. People ex rel. Fresno Firefighters (1999) 71 Cal.App.4th 82, 98, 83 Cal.Rptr.2d 603; Los Rios Community College District, supra, 12 PERC ¶ 19112, p. 513; South San Francisco Unified School District, supra, 7 PERC ¶ 14243, p. 977; Los Angeles Community College District, supra, 6 PERC ¶ 13241, p. 926; see Michigan Bell Telephone Co. (1992) 306 NLRB 281, 282.[5]) Thus, the parties expressly waive the right to meet and confer on those matters during the term of the agreement.
A waiver of the statutory right to meet and confer must be "clear and unmistakable" to be effective. (Building Material, supra, 41 Cal.3d at p. 668, 224 Cal. Rptr. 688, 715 P.2d 648; California State Employees' Assn. v. Public Employment Relations Bd., supra, 51 Cal.App.4th at pp. 937-938, 59 Cal.Rptr.2d 488; see Metropolitan Edison Co. v. NLRB (1983) 460 U.S. 693, 708, 103 S.Ct. 1467.)
We independently interpret a contract, such as the MOU, where the interpretation *336 does not turn on the credibility of extrinsic evidence. (Parsons v. Bristol Development Co. (1965) 62 Cal.2d 861, 865, 44 Cal.Rptr. 767, 402 P.2d 839; City of El Cajon v. El Cajon Police Officers' Assn. (1996) 49 Cal.App.4th 64, 70-71, 56 Cal. Rptr.2d 723.) We assume for the purpose of analysis that the city council approved the MOU, although the city cites no evidence in the record to support that assumption.
The Meyers-Milias-Brown Act requires a public agency to refrain from making unilateral changes regarding matters within the scope of representation until after the public agency meets and confers with representatives of recognized employee associations, as stated ante. We conclude that the association did not clearly and unmistakably waive that right.
Section XXXI.B. of the MOU, quoted ante in full, does not state that the city or the association may act unilaterally concerning matters within the scope of representation. Such a broad grant of authority to either party would completely undermine the MOU and would be absurd. Rather, the provision states that the parties waive the right to meet and confer and are not obligated to meet and confer during the term of the agreement "with respect to any subject matter, whether referred to or covered in this Agreement or not, even though each subject or matter may not have been within the knowledge or contemplation of either or both the City or the Association at the time they met and negotiated on and executed the Agreement, and even though such subjects or matters were proposed and later withdrawn."
In light of the purpose of the Meyers-Milias-Brown Act to promote negotiation between public agencies and their employees (§ 3500, subd. (a)) and, by logical extension, to protect agreements reached as a result of those negotiations, we construe this provision to mean that a party is not required to meet and confer concerning the other party's proposal, not that either party may act unilaterally without meeting and conferring. The practical effect of this provision is to prevent the city from discharging its duty to meet and confer in good faith with the association, and therefore prevent the city from implementing changes on matters within the scope of the provision, during the term of the MOU. (See Los Rios Community College District, supra, 12 PERC ¶ 19112, p. 513; South San Francisco Unified School District, supra, 7 PERC ¶ 14243, p. 977.) The provision does not authorize the city to act unilaterally concerning matters within the scope of representation. (Los Angeles Community College District, supra, 6 PERC ¶ 13241, p. 926 ["[A zipper clause] does not ... cede to the employer the power to make unilateral changes in the status quo. [Citation.]"].)

4. The Association Is Not Barred by Laches or Waiver Due to Delay or Due to its President's Participation in the Advisory Panel

"[L]aches is an equitable defense to the enforcement of a stale claim and requires a showing of unreasonable delay plus either the plaintiffs acquiescence in the act complained of or prejudice to the defendant resulting from the delay. (Conti v. Board of Civil Service Commissioners (1969) 1 Cal.3d 351, 359 [82 Cal. Rptr. 337, 461 P.2d 617].) The doctrine of laches may be asserted only in a suit in equity. [Citation.]" (People v. Koontz (2002) 27 Cal.4th 1041, 1088, 119 Cal. Rptr.2d 859, 46 P.3d 335.) We generally review a trial court's laches ruling under the substantial evidence standard. (Miller v. Eisenhower Medical Center (1980) 27 Cal.3d 614, 624, 166 Cal.Rptr. 826, 614 P.2d 258; Bono v. Clark (2002) 103 Cal. App.4th 1409, 1417, 128 Cal.Rptr.2d 31.)
*337 Laches is not available as a defense in this action because this is not a suit in equity. Moreover, substantial evidence supports the trial court's findings that there was no unreasonable delay in the association's assertion of rights and that the city suffered no prejudice.
We conclude further that the association's president's participation as a member of the advisory panel that advised the police commission on the proposed vehicle stop policy did not constitute a waiver of the association's right to meet and confer with the city before the city adopted the policy. There is no evidence that the association and the city regarded the president in his role as a member of the advisory panel as a collective bargaining representative on behalf of the association as opposed to one of several members of an advisory panel, that the city afforded the president rights due to the association under section 3505, that the objective of the advisory process was to reach a binding agreement between the association and the city pursuant to the Meyer-Milias-Brown Act, or that the association in any manner waived its statutory rights under the act.

DISPOSITION
The judgment is reversed with directions to the superior court to grant the petition for writ of mandate and order the city to revoke its decision to implement the vehicle stop policy and comply with its obligation under the Meyers-Milias-Brown Act to meet and confer with the association before making another decision on the matter. The association is entitled to costs on appeal.
We Concur: KITCHING and ALDRICH, JJ.
NOTES
[1] All statutory references are to the Government Code unless otherwise specified.
[2] "The governing body of a public agency, or such boards, commissions, administrative officers or other representatives as may be properly designated by law or by such governing body, shall meet and confer in good faith regarding wages, hours, and other terms and conditions of employment with representatives of such recognized employee organizations, as defined in subdivision (b) of Section 3501, and shall consider fully such presentations as are made by the employee organization on behalf of its members prior to arriving at a determination of policy or course of action.

"`Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or where such procedures are utilized by mutual consent." (§ 3505.)
[3] Penal Code section 13519.4 expressly prohibits racial profiling by law enforcement officers, stating in part, "(c) . . . The Legislature finds and declares as follows:

"(1) Racial profiling is a practice that presents a great danger to the fundamental principles of a democratic society. It is abhorrent and cannot be tolerated.
"(2) Motorists who have been stopped by the police for no reason other than the color of their skin or their apparent nationality or ethnicity are the victims of discriminatory practices.
"(3) It is the intent of the Legislature in enacting the changes to Section 13519.4 of the Penal Code made by the act that added this subdivision that more than additional training is required to address the pernicious practice of racial profiling and that enactment of this bill is in no way dispositive of the issue of how the state should deal with racial profiling.
"(4) The working men and women in California law enforcement risk their lives every day. The people of California greatly appreciate the hard work and dedication of law enforcement officers in protecting public safety. The good name of these officers should not be tarnished by the actions of those few who commit discriminatory practices.
"(d) `Racial profiling,' for purposes of this section, is the practice of detaining a suspect based on a broad set of criteria which casts suspicion on an entire class of people without any individualized suspicion of the particular person being stopped.
"(e) A law enforcement officer shall not engage in racial profiling."
[4] The state Public Employment Relations Board (PERB) adjudicates, among other disputes, alleged violations of the Meyers-Milias-Brown Act involving employees other than peace officers. (§§ 3509, subd. (b), 3511.) PERB decisions are persuasive authority on legal matters ordinarily entrusted to the agency and within the agency's expertise. (San Lorenzo Education Assn. v. Wilson (1982) 32 Cal.3d 841, 850, 187 Cal.Rptr. 432, 654 P.2d 202; Riverside Sheriffs Assn. v. County of Riverside, supra, 106 Cal.App.4th at p. 1291, 131 Cal.Rptr.2d 454; California State Employees' Assn. v. Public Employment Relations Bd. (1996) 51 Cal.App.4th 923, 934-935, 937-938, 943-946, 59 Cal.Rptr.2d 488.)
[5] Federal opinions under the National Labor Relations Act are persuasive authority in California to the extent that California law parallels federal law. (Building Material, supra, 41 Cal.3d at p. 658, 224 Cal.Rptr. 688, 715 P.2d 648.)