Filed 3/17/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| SANTA CLARA COUNTY CORRECTIONAL PEACE OFFICERS' ASSOCIATION, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> COUNTY OF SANTA CLARA, <br><br> Defendant and Respondent. | H037418 <br> (Santa Clara County <br> Super. Ct. No. 1-11-CV-205583) |

# I.  INTRODUCTION

At issue in this appeal is whether the County of Santa Clara (County) complied with its statutory and contractual obligations regarding meeting and conferring in good faith before reducing the work schedules for an unspecified number of correctional peace officers who are members of the Santa Clara County Correctional Peace Officers' Association, Inc. (Association).  The officers work for the County's Department of Corrections (DOC) in staffing the County's jails, though they remain Sheriff's Deputies.

The County and the Association entered into a written Memorandum of Understanding (sometimes MOU) effective on June 2, 2008 that created three different work schedules, working either five eight-hour days a week (the 5/8 Plan) or four ten-hour days a week (the 4/10 Plan) for a total of 80 hours biweekly, or working 12.25 hours a day four days one week and three days the next (the 12 Plan) for a total of 85.75 hours biweekly.  In order to reduce the County's total budget for fiscal year 2012 (July 1, 2011 through June 30, 2012) while avoiding layoffs, the DOC proposed, among other things, a reduction of the 12 Plan to working mostly 12 hour shifts totaling 80 hours biweekly, not

85.75 hours. The County and the Association met twice in early June 2011 before the County's Board of Supervisors adopted a proposed budget on June 15, 2011 which included a modified 12 Plan. After the budget was adopted, the parties met again and the Association's members voted on the County's proposals.

On July 22, 2011, the Association filed a verified petition for writ of mandate, alleging that the County, in modifying the 12 Plan, had breached duties to meet and confer and to bargain in good faith under the MOU, the Meyers-Milias-Brown Act (Govt. Code, §§ 3500 - 3511[1]; sometimes MMBA), and the County's Code. After a court trial based on documents submitted by both sides, the court denied the Association's petition, finding that a vote by the Association's members established both that they preferred the County's modified plan and that the County had met and conferred in good faith.

The parties renew their contentions on appeal. The County contends that the Association has failed to exhaust its contractual remedies. The Association disputes this and contends that the County set an arbitrary deadline and failed to complete its obligation to meet and confer in good faith, including participating in impasse resolution, before implementing the work schedule change. The County contends that because it reserved rights in the MOU to convert 12 Plan assignments to other plans, it fulfilled all of its statutory and contractual obligations. For the reasons stated below, we will affirm the judgment after concluding that the County complied with its obligations to meet and confer about this reduction in working hours.

## A. THE MEMORANDUM OF UNDERSTANDING

The County and the Association entered into a Memorandum of Understanding effective on June 2, 2008. The term of the MOU was through "May 29, 2011, and from year to year thereafter." (MOU section 27.) The MOU specified the monthly pay scales for correctional officers in different classifications, their hours of work, and lengths of shifts, among other things.

---

[1] Unspecified section references are to the Government Code.

Three alternative shifts are recognized as a normal work day: the eight-hour shift of the 5/8 Plan, the 10-hour shift of the 4/10 Plan, and the 12.25-hour shift of 12 Plan described above. (MOU section 7.1.) The MOU provided that a full work week is 40 hours except as otherwise provided in the MOU or by law. (*Ibid.*) The 12 Plan, by calling for working 85.75 hours biweekly, was thus an exception to a 40-hour work week. According to the Association's mandate petition, the 12 Plan has been in place for 30 years.

The MOU defined overtime in Section 7.5 as any time worked on a single day in excess of the defined shift length, or any time worked in a biweekly pay period over 80 hours. Section 7.5 further provided that "[f]or the employees in the Twelve (12) Plan all hours worked from 80 to 85.75 hours per pay period shall be considered for PERS purposes as overtime paid at the straight time rate." (MOU section 7.5 subd. (a).) In another section, the MOU provided that "[a]ll hours worked by such employees on the Twelve Plan (and their briefing time) shall be compensated at straight time, up to 12.25 hours per day and 85.75 hours per pay period, with all hours in excess thereof to be considered overtime." (MOU section 7.1, subd. (a).)

Section 7.1, subdivision (a) also provided: "Employees assigned by the Chief of Correction to the Twelve Plan will continue to work on the Twelve (12) Plan during the term of this Memorandum."

Section 7.1, subdivision (b) (sometimes section 7.1 (b)) provided: "The Appointing Authority reserves the right to convert assignments on the Twelve Plan to either a 5/8 or 4/10 Plan, upon the giving of forty-five (45) calendar days' advance notice of such change to the Association, which shall be afforded the opportunity to meet and confer on such a proposed change prior to its implementation."

It is up to the "Appointing Authority," the County, to "set up a standard shift and days off assignment policy within each department," based first "on the administrative needs of the department, so as to have a certain minimum number of experienced and/or qualified or skilled personnel on a shift." (MOU section 7.2.)

The MOU also included a grievance procedure that we discuss below.

3

**B. THE MEETINGS AND THE ASSOCIATION VOTE**

John Hirokawa was involved in meetings with the Association in 2011 as the Undersheriff and also Acting Chief of the DOC. He filed a declaration stating the following.[2] Facing a projected County budget deficit of $230 million, the DOC was asked to make budget cuts of $15 million while avoiding staff layoffs, if possible. Among the proposals was to alter the 12 Plan by eliminating the built-in 5.75 hours of biweekly overtime with a projected annual savings of $5,860,683. This modification entailed related changes of officers reporting directly to their posts instead of the briefing room, supervisors checking staff in and out, and officers sharing information during the shift change and by information technology.

On May 19, 2011, the Acting Chief notified the Association by certified letter of its "intent to change the 12-plan work schedule to a 5/8, 4/10 or modified 12-plan" (80-hour work schedule) to become effective on July 4, 2011. "These proposed changes in the above described assignments will not be implemented until such time as the parties shall have the opportunity to meet and confer." The parties agree that July 4, 2011 was the start of a new pay period under a new County budget.

The Acting Chief later attended three meetings with representatives of the Association, counsel for both sides, and other interested parties, including the County's Labor Relations Representative Ramsin Nasseri. At the first meeting on June 2, 2011, the Acting Chief provided the Association with several proposed work schedules, including versions of how the 12 Plan could be modified to result in working 80 hours biweekly. The Association responded by questioning the existence of a budget deficit and the Chief's authority to modify the 12 Plan and complaining about the unfair impact on Association members. The Association rejected the explanation that the reduction in hours was a business necessity in order to meet the DOC's $15 million target.

---

[2] The Association has filed no counterdeclaration regarding what transpired at the meetings. Instead, on appeal it relies on parts of Hirokawa's declaration as well as its verified petition.

4

At the second meeting on June 13, 2011, the Association questioned how the schedule changes would affect the members. Custody Administrative Captain David Sepulveda explained the operational details as best he could. Some questions could not be answered because the County was awaiting the Association's feedback. The Association complained about a seven percent salary reduction and contended that the goal could be accomplished by retirements and layoffs. The Acting Chief said that retirements and layoffs would not yield enough savings. He encouraged the Association to attend the County's upcoming budget hearings. The Association did not offer an alternative plan to save $6.1 million.

A third meeting was scheduled for June 20, 2011. Meanwhile, on June 15, the County Board of Supervisors considered the DOC's recommendations and, after hearing from several Association representatives, unanimously voted to accept the County Executive's proposed budget, which included the modified 12 Plan.

According to the Acting Chief, at the meeting on June 20, 2011, the Association still disputed the existence of a budget deficit and failed to propose another method for saving $15 million. The Chief advised the Association that every day of delay in implementing the plan was costing the County about $17,000. The County agreed to the Association's request to delay implementation until its members could vote on the County's proposals.

A report on the members' vote on the County's proposals was originally promised on July 2, 2011, and was delivered by email at the end of the work day on July 6, 2011. The vote was reported as a 200 to 15 rejection of the County's MOU proposal. As to the different 12 Plan schedules presented, 236 members voted in favor of one eight-hour day per pay period with the rest 12-hour days, as opposed to 13 members voting for two ten-hour days per pay period and 10 voting for the 5/8 schedule. The email disclaimed any consent to a reduction of the 85.75 biweekly schedule.

## C. THE TRIAL COURT'S FINDINGS

After a court trial based on the documents submitted, the trial court made the following findings in denying the petition for writ of mandate. "1. Pursuant to the

Memorandum of Understanding between the County of Santa Clara and the Correctional Peace Officers' Association ('MOU'), the Appointing Authority reserved the right to convert assignments on the Twelve Plan to either a 5/8 or a 4/10 Plan upon the giving of 45 calendar days advance notice.

"2. Although the County did not adopt the 5/8 or the 4/10 schedule the fact that the County adopted a modified 12 Plan that Petitioner's membership preferred established that the County met and conferred in good faith.

"3. Additionally, because Petitioner's members chose the modified 12 Plan over the other proposed schedules, the Court finds there was mutual agreement and, therefore the parties did not need to declare impasse and mediation was not required.

"The Court therefore concludes the County satisfied its obligations to meet and confer pursuant to section 7.1 (b) of the MOU."

## II. THE STANDARDS OF REVIEW

This appeal presents several issues that require application of different standards of review. How to interpret a statute such as the MMBA presents questions of law that we review independently on appeal. (*DiQuisto v. County of Santa Clara* (2010) 181 Cal.App.4th 236, 256; *Mendocino County Employees Assn. v. County of Mendocino* (1992) 3 Cal.App.4th 1472, 1477.) It is ultimately a judicial function to interpret a statute, but courts will defer to a statutory interpretation by an agency like the Public Employment Relations Board ("PERB") that administers a statute, unless it is clearly erroneous. (*Cumero v. Public Employment Relations Bd.* (1989) 49 Cal.3d 575, 586-587.) The PERB has exclusive jurisdiction over alleged violations of the MMBA in most cases (§ 3509), but peace officers are among those public employees who are exempt from its exclusive jurisdiction. (§ 3511; see *Coachella Valley Mosquito and Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1077, fn. 1.)

County codes and ordinances are subject to the same independent construction on appeal as statutes. (*People v. Beaumont Investment, Ltd.* (2003) 111 Cal.App.4th 102, 113.)

6

The interpretation of an MOU also presents questions of law that we review independently on appeal when, as here, there was no conflicting extrinsic evidence presented as to its meaning. (Compare *Service Employees Internat. Union v. City of Los Angeles* (1996) 42 Cal.App.4th 1546, 1552-1553 [undisputed evidence] and *Mendocino County Employees Assn. v. County of Mendocino, supra,* 3 Cal.App.4th 1472, 1477 [same] with *Beverly Hills Firemen's Assn., Inc. v. City of Beverly Hills* (1981) 119 Cal.App.3d 620, 629-630 [conflicting evidence].)

However, whether a party actually engaged in meetings in good faith is generally a factual question, and the fact-finder's express or implicit determination will be upheld on appeal if supported by substantial evidence. (*Lipow v. Regents of University of California* (1975) 54 Cal.App.3d 215, 227; *Placentia Fire Fighters v. City of Placentia* (1976) 57 Cal.App.3d 9, 25 (*Placentia*).)

"'[T]he applicable standards of appellate review of a judgment based on affidavits or declarations are the same as for a judgment following oral testimony: We must accept the trial court's resolution of disputed facts when supported by substantial evidence; we must presume the court found every fact and drew every permissible inference necessary to support its judgment, and defer to its determination of credibility of the witnesses and the weight of the evidence. [Citation.]'" (*Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 653.)

### III. DISCUSSION

#### A. THE ASSOCIATION DID NOT FAIL TO EXHAUST A CONTRACTUAL REMEDY

In the trial court, the County asserted that this action is barred because the Association failed to exhaust its contractual remedies and that a "party to a labor agreement that provides for binding grievance arbitration *must* exhaust contractual remedies in the absence of facts excusing exhaustion." The County renews this argument on appeal.

Section 23 of the MOU did establish a grievance procedure for resolving both "employee grievances" and "organizational grievances" through binding arbitration. However, excluded from the grievance procedure, as the Association points out, are

7

"[i]tems within the scope of representation and subject to the meet and confer process." (Section 23, subd. (a) 2g.) The Association had no obligation under the MOU to file a grievance regarding a negotiable topic that was subject to the meet and confer process. (Cf. *Long Beach Police Officer Assn. v. City of Long Beach* (1984) 156 Cal.App.3d 996, 1003.) As we will explain, the topic of a proposed reduction of working hours was a negotiable one.

In light of this conclusion, we need not consider the Association's alternate contentions that the grievance procedure has expired along with the MOU and that invoking the procedure would have been futile in light of the County's adoption of the modified 12 Plan.

## B. THE MEYERS-MILIAS-BROWN ACT

"With the enactment of the George Brown Act (Stats. 1961, ch. 1964) in 1961, California became one of the first states to recognize the right of government employees to organize collectively and to confer with management as to the terms and conditions of their employment. Proceeding beyond that act the Meyers-Milias-Brown Act (Stats. 1968, ch. 1390) authorized labor and management representatives not only to confer but to enter into written agreements for presentation to the governing body of a municipal government or other local agency." (*Glendale City Employees' Assn., Inc. v. City of Glendale* (1975) 15 Cal.3d 328, 331; fn. omitted.)

"The MMBA has two stated purposes: (1) to promote full communication between public employers and employees, and (2) to improve personnel management and employer-employee relations. (§ 3500.) To effect these goals the act gives local government employees the right to organize collectively and to be represented by employee organizations (§ 3502), and obligates employers to bargain with employee representatives about matters that fall within the 'scope of representation' (§§ 3504.5, 3505). [¶] Specifically, section 3504.5 provides that public agencies must give employee organizations 'reasonable written notice' of any proposed 'ordinance, rule, resolution, or

8

regulation directly relating to matters within the scope of representation'[3]; section 3505 provides that representatives of public agencies and employee organizations 'shall have the mutual obligation personally to *meet and confer* promptly upon request by either party . . . and to endeavor to reach agreement on matters within the *scope of representation* prior to the adoption by the public agency of its final budget for the ensuing year.'  (Italics added.)"  (*Building Material & Construction Teamsters' Union v. Farrell* (1986) 41 Cal.3d 651, 657 (*Farrell*); cf. *Claremont Police Officers Assn. v. City of Claremont* (2006) 39 Cal.4th 623, 630 (*Claremont*).)

"The recurrent phrase, 'scope of representation,' " is defined in section 3504 to include 'all matters relating to employment conditions and employer-employee relations, including, but not limited to, *wages, hours, and other terms and conditions of employment,* except, however, that the scope of representation shall not include consideration of the *merits, necessity, or organization of any service* or activity provided by law or executive order.'  (Italics added.)"  (*Farrell*, *supra,* 41 Cal.3d 651, 658.)

"[T]he phrase 'wages, hours, and other terms and conditions of employment' was taken directly from the National Labor Relations Act (NLRA) (29 U.S.C. § 158 (d))" and state courts have accordingly looked for guidance to federal decisions in interpreting this phrase (*Farrell*, *supra,* 41 Cal.3d 651, 658), even though the NLRA has left it to individual states to regulate labor relations between and states and their political subdivisions and their employees.  (29 U.S.C. § 152, subd. (2); *Davenport v. Washington Educ. Assn.* (2007) 551 U.S. 177, 181.)

---

**3**  Section 3504.5 excuses public agencies from providing reasonable notice "in cases of emergency as provided in this section."  (*Id.*, subd. (a).)  Subdivision (b) provides:  "In cases of emergency when the governing body or the designated boards and commissions determine that an ordinance, rule, resolution, or regulation must be adopted immediately without prior notice or meeting with a recognized employee organization, the governing body or the boards and commissions shall provide notice and opportunity to meet at the earliest practicable time following the adoption of the ordinance, rule, resolution, or regulation."

The phrase "*merits, necessity or organization of any service* or activity" has no counterpart in the NLRA. (*Farrell*, *supra,* 41 Cal.3d 651, 658.) "This exclusionary language, which was added in 1968, was intended to 'forestall any expansion of the language of "wages, hours and working conditions" to include more general managerial policy decisions.' [Citation]; Stats. 1968, ch. 1390, § 4, p. 2727.) 'Federal and California decisions both recognize the right of employers to make unconstrained decisions when fundamental management or policy choices are involved.' ([*Farrell*]*, supra,* at p. 663; [citations].)" (*Claremont*, *supra,* 39 Cal.4th 623, 631.)

Deciding whether a topic is bargainable under the MMBA and subject to a meet and confer requirement involves "a three-part inquiry. First, we ask whether the management action has 'a significant and adverse effect on the wages, hours, or working conditions of the bargaining-unit employees.' ([*Farrell*]*, supra,* 41 Cal.3d at p. 660.) If not, there is no duty to meet and confer. (See § 3504; [citation].) Second, we ask whether the significant and adverse effect arises from the implementation of a fundamental managerial or policy decision. If not, then, as in [*Farrell*]*,* the meet-and-confer requirement applies. ([*Farrell*]*, supra,* at p. 664.) Third, if both factors are present - if an action taken to implement a fundamental managerial or policy decision has a significant and adverse effect on the wages, hours, or working conditions of the employees - we apply a balancing test. The action 'is within the scope of representation only if the employer's need for unencumbered decisionmaking in managing its operations is outweighed by the benefit to employer-employee relations of bargaining about the action in question.' ([*Farrell*]*, supra,* at p. 660.) In balancing the interests to determine whether parties must meet and confer over a certain matter (§ 3505), a court may also consider whether the 'transactional cost of the bargaining process outweighs its value.' [Citation.]" (*Claremont*, *supra*, 39 Cal.4th 623, 638.) This balancing test derives from federal law. (*Farrell*, *supra,* at p. 663; *International Assn. of Fire Fighters, Local 188, AFL-CIO v. Public Employment Relations Bd.* (2011) 51 Cal.4th 259, 272-273 (*Local 188*).)

**C. A REDUCTION IN WORKING HOURS IS GENERALLY A BARGAINABLE TOPIC**

These general principles aid in determining to what extent the County was required to meet and confer about its proposal to modify the 12 Plan. On appeal there is no real dispute that the County was obliged to meet and confer prior to reducing the working hours for certain represented employees from 85.75 hours to 80 hours biweekly. Case law has determined that at least some aspects of a reduction of working hours or a change in the scheduling of the hours are topics subject to collective bargaining. The MOU also recognized this obligation.

In *Fire Fighters Union v. City of Vallejo* (1974) 12 Cal.3d 608 (*Vallejo*), the Supreme Court provided a framework for identifying the kinds of topics subject to bargaining by public employees. In that case, the court was called upon to interpret provisions of the Vallejo City Charter that were virtually identical to provisions in the MMBA. (*Id.* at p. 614.) The charter provided in part that "[i]t shall be the right of City employees individually or collectively to negotiate on matters of wages, hours, and working conditions, but not on matters involving the merits, necessity, or organization of any service or activity provided by law." (*Id.* at p. 613, fn. 2.)

That appeal considered several proposals by the union, including two particularly relevant to our case. The union had proposed two work schedules for firefighters, "a maximum of 40 hours per week for fire fighters on 8-hour shifts and 56 hours per week for fire fighters on 24-hour shifts." (*Vallejo*, *supra,* at p. 617.) The Supreme Court quickly rejected the city's argument that the schedules of hours were exempt from bargaining as pertaining to the organization of the fire service. (*Id.* at pp. 617-618.)

The union also proposed a certain method for reducing personnel. The court commented that "[a] reduction of the entire fire fighting force based on the city's decision that as a matter of policy of fire prevention the force was too large would not be arbitrable in that it is an issue involving the organization of the service." (*Vallejo*, *supra,* 12 Cal.3d at p. 621.) On the other hand, while an employer may unilaterally decide that layoffs are necessary, it must bargain about which employees and how many are affected and when layoffs will occur. (*Ibid.*) To the extent that the layoffs might affect the

11

workload or safety of the remaining employees, it is also subject to bargaining.  (*Id.* at p. 622.)

In *Huntington Beach Police Officers' Assn. v. City of Huntington Beach* (1976) 58 Cal.App.3d 492 (*Huntington Beach*), the city took the position that a change to a 40-hour work week of five eight-hour days from four ten-hour days (the Ten-Plan) was nonnegotiable.  It was excluded from negotiations by both a city resolution and the applicable memorandum of understanding.  (*Id.* at pp. 495-496.)  The appellate court concluded in part that "[t]he city's EER Resolution purporting to render work schedule nonnegotiable [*sic*] is in conflict with the declared purpose of the MMB Act and the mandatory language of section 3505.  It is therefore invalid."  (*Id.* at p. 503.)

The city in that appeal did not point to any part of the memorandum of understanding that made this change nonnegotiable.  The appellate court nevertheless reviewed the agreement and concluded, "[a]lthough the agreement inferentially recognizes the ultimate authority of the chief to decide to what extent the Ten-Plan shall be operative in his department, it does not, either expressly or by implication, provide that changes in policy affecting the application of the plan shall not be subject to the meet and confer process."  (*Huntington Beach*, *supra,* at p. 504.)  Implementing the change without meeting and conferring violated the MMBA.  (*Ibid.*)

In *Independent Union of Pub. Service Employees v. County of Sacramento* (1983) 147 Cal.App.3d 482 (*Sacramento*), the county proposed to start the eight-hour shift for custodial workers at 1 p.m. instead of 5 p.m.  (*Id.* at p. 486.)  The county conceded that the shift change affected the hours of employment, but contended that, in their memorandum of understanding, "it retained the right to unilaterally assign its employees to any shift without first meeting and conferring with" the union.  (*Id.* at p. 487.)  The court stated:  "Petitioner does not contest the County's *power* to assign employees, but contends the County must meet and confer before exercising this power.  We agree.  The power to 'assign' employees is not inconsistent with the meet and confer requirement.  As long as the County meets and confers in good faith, it may assign its employees however it sees fit."  (*Ibid.*)

12

The contractual authority on which the County relies to justify its modification of the 12 Plan, section 7.1 (b) of the MOU, states: "The Appointing Authority reserves the right to convert assignments on the Twelve Plan to either a 5/8 or 4/10 Plan, upon the giving of forty-five (45) calendar days' advance notice of such change to the Association, *which shall be afforded the opportunity to meet and confer on such a proposed change prior to its implementation.*" (Our emphasis.) By giving the Association the opportunity to meet and confer prior to implementation of a change of assignments, the County recognized its own obligation to meet and confer on this topic. We understand the County to maintain that it fulfilled its duty, not that it could implement the change without meeting and conferring.

**D. THE BUSINESS NECESSITY DEFENSE HAS NOT BEEN ESTABLISHED**

In the trial court, the County asserted in its opposition to the mandate petition that "a compelling business necessity may also justify unilateral action." County repeats this assertion on appeal, although the trial court made no express finding about it.

In the area of private employment, "[t]he NLRB has recognized the existence of a compelling business justification to excuse or justify the unilateral implementation of a change in wages or working conditions. (See *Winn-Dixie Stores* (1979) 243 NLRB No. 972, 101 LRRM 1534.) However, economic considerations alone are not sufficient to justify a unilateral change. (*Airport Limousine Service, Inc.* (1977) 231 NLRB No. 932, 96 LRRM 1177, 1179-1180.) Moreover, neither exigent circumstances nor a business necessity completely absolves an employer of its duty to notify and bargain with the union. Bargaining is required to the extent that the situation permits, although an impasse is not necessary. Whether the business necessity defense exists is an issue determined on a case-by-case basis. (*Joe Maggio, Inc. et al.* (1982) 8 ALRB No. 72.)" (*Cardinal Distributing Co. v. Agricultural Labor Relations Bd.* (1984) 159 Cal.App.3d 758, 772.)

California appellate courts have not yet explicitly applied or adapted this business necessity defense to the context of public employment. The PERB has, however, applied this doctrine to public employment by the County. "At times, a compelling operational necessity can justify an employer acting unilaterally before completing its bargaining

13

obligation. [Citation.] However, the employer must demonstrate 'an actual financial emergency which leaves no real alternative to the action taken and allows no time for meaningful negotiations before taking action.'" (*County of Santa Clara* (2010) PERB Decision 2114M p. 16, 2010 Cal. PERB LEXIS 29; *County of Santa Clara* (2010) PERB Decision 2120M p. 16, 2010 Cal. PERB LEXIS 35.)

As we have noted above (*ante*, fn. 3), public agencies are excused from providing reasonable notice of proposed changes "in cases of emergency" (§ 3504.5, subds. (a), (b)), "but are required to provide notice and opportunity to meet at the earliest practicable time" after implementing the changes (*id.*, subd. (b)). *Sonoma County Organization etc. Employees v. County of Sonoma* (1991) 1 Cal.App.4th 267 stated: "Just what shall constitute an emergency is left unexplained by the MMBA. This omission is of no moment, given that emergency has long been accepted in California as an unforeseen situation calling for immediate action." (*Id.* at p. 276.) The appellate court in that case discussed several criteria for an emergency and recognized that an imminent and substantial threat to public health certainly qualified. (*Id.* at p. 277.) In this case the County, by its own account, was able to meet three times prior to implementing the proposed change in work schedules. We agree with the Association that the evidence does not establish a financial emergency or business necessity that would temporarily suspend the obligation to meet and confer before implementing a change. We conclude the circumstances here were more in the nature of foreseeable budget cuts than a temporary emergency requiring an immediate response.

## E. IMPASSE RESOLUTION

### 1. The MMBA does not impose an impasse resolution procedure

The Association alternatively argues that "the County failed to meet and confer with" the Association and that the County "failed to complete the meet and confer process regarding the decision to adopt the Modified 12 Plan because it failed to allocate sufficient time to complete the process, did not reach an agreement with the [Association] to adopt the Modified 12 Plan and failed to exhaust required impasse procedures." Since

14

the parties indisputably met, we will assume that the Association's real point is that the County did not complete the process.

The County responds in part that the MMBA did not require the parties to resolve all disagreements through impasse procedures. The County is correct.

Several California statutes applicable to different kinds of public employees contain mandatory procedures for identifying and resolving a bargaining impasse, usually requiring mediation. (E.g., § 3548 [public school employees]; § 3590 [higher education employees; statutory language virtually identical to § 3548]; Pub. Util. Code, § 99568 [public transit employees]; Bus. & Prof. Code, § 19455, subd. (d)(8)(B) [racetrack backstretch workers].)

In contrast with those statutes, the applicable version of the MMBA did not mandate an impasse resolution procedure. This is what it says on the topic. " 'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer promptly upon request by either party and continue for a reasonable period of time in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. *The process should include adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent.*" (§ 3505; our emphasis.) This statute contemplates resolution of impasse by procedures that are imposed by other laws or by mutual agreement, not by the MMBA. The MMBA, unlike other statutes, provides no definition of "impasse." (E.g., §§ 3540.1, subd. (f); 3562, subd. (j).)

Consistent with this permissive approach, section 3505.2 does not require mediation. Instead it allows the parties to agree on mediation and a mediator. (*Placentia*, *supra,* 57 Cal.App.3d 9, 21 ["In the event of a failure to reach agreement after good faith efforts over a reasonable time to do so, the parties may agree to place the disputed

15

matters in the hands of a mediator, but are not required to do so."]; *Alameda County Employees' Assn. v. County of Alameda* (1973) 30 Cal.App.3d 518, 534 ["there is a duty to 'meet and confer in good faith,' but there is no duty to agree to mediation."].)

Former section 3505.4 (Stats. 2000, ch. 316, § 1) provided: "If after meeting and conferring in good faith, an impasse has been reached between the public agency and the recognized employee organization, and *impasse procedures, where applicable, have been exhausted*, a public agency that is not required to proceed to interest arbitration[4] may implement its last, best, and final offer, but shall not implement a memorandum of understanding. The unilateral implementation of a public agency's last, best, and final offer shall not deprive a recognized employee organization of the right each year to meet and confer on matters within the scope of representation, whether or not those matters are included in the unilateral implementation, prior to the adoption by the public agency of its annual budget, or as otherwise required by law." (Our emphasis.) Though this statute was repealed and replaced as of January 1, 2012, the Association concedes that the former statute is the one applicable in this case.[5]

---

[4] The MMBA does not itself define "interest arbitration." This court has stated: "'Resolution of disputed contract issues through a binding process is commonly referred to as "interest arbitration" in labor law.' [Citation.] '"Interest arbitration, unlike grievance arbitration, focuses on what the terms of a new agreement should be, rather than the meaning of the terms of the old agreement."'" (*City of San Jose v. International Assn. of Firefighters, Local 230* (2009) 178 Cal.App.4th 408, 414, quoting *Hess Collection Winery v. Agricultural Labor Relations Bd.* (2006) 140 Cal.App.4th 1584.)

[5] Former section 3505.4 was repealed and replaced amidst a number of amendments to the MMBA effective on January 1, 2012. Assembly Bill No. 646 (2011-2012 Reg. Sess.) repealed and replaced section 3505.4 and added sections 3505.5 and 3505.7. The nonexistence of mandatory impasse procedures in the MMBA is what prompted the author of Assembly Bill No. 646 to propose this new legislation. (Assem. Com. on Public Employees, Retirement and Social Security, Analysis of Assem. Bill No. 646 (2011-2012 Reg. Sess.) as amended Mar. 23, 2011, at <(http://info.sen.ca.gov/pub/11-12/bill/asm/ ab_0601-0650/ab_646_cfa_20110503 _104246_asm_comm.html> [as of June 26, 2012].)

We recognize that the California Supreme Court has stated more than once that public agencies are required "to refrain from making unilateral changes in employees' wages and working conditions until the employer and employee association have bargained to impasse." (*Santa Clara County Counsel Attys. Assn.. v. Woodside* (1994) 7 Cal.4th 525, 537; *Coachella Valley Mosquito and Vector Control Dist. v. California Public Employment Relations Bd.* (2005) 35 Cal.4th 1072, 1083; *San Francisco Fire Fighters Local 798 v. City and County of San Francisco* (2006) 38 Cal.4th 653, 670.) However, the statement was dictum in each case. Only the third case involved a factual impasse. The impasse situation in *San Francisco Fire Fighters Local 798 v. City and County of San Francisco*, *supra,* 38 Cal.4th 653 was governed by specific impasse procedures in the charter of the City and County of San Francisco. (*Id.* at p. 670.) Those procedures required the parties to bargain to impasse and then submit the matter to binding arbitration. (*Ibid.*) The California Supreme Court observed that "[t]he Charter thus provides a rule of impasse resolution that differs from that generally provided to local government employees through the Meyers-Milias-Brown Act. (Gov. Code, § 3500 et seq.)" (*Ibid.*)

The applicable version of the MMBA did not require public agencies to reach agreement. "Even if the parties meet and confer, they are not required to reach an agreement because the employer has 'the ultimate power to refuse to agree on any particular issue. [Citation.]' ([*Farrell*], *supra ,* 41 Cal.3d at p. 665.) However, good faith under section 3505 'requires a genuine desire to reach agreement.' [Citation.]" (*Claremont*, *supra,* 39 Cal.4th 623, 630.) "Agreement between the public agency and its employees is to be sought as the result of meetings and conferences held in good faith for the purpose of achieving agreement if possible; but agreement is not mandated. It follows that government is not required to cease operations because agreement has not been reached." (*Placentia*, *supra,* 57 Cal.App.3d 9, 21.)

17

## 2. The Santa Clara County Code does provide for impasse resolution

As the Association contends, the Santa Clara County Code provides for impasse resolution in the Employee Relations Ordinance.  Division A25 of the Code pertains to the Personnel Department.  Article 6 of that Division is entitled "Impasse Procedures."

Section A25-414 of that Article states:  "(a)  If the appropriate level of management and the recognized employee organization fail to reach agreement prior to June first of a fiscal year on a matter within the scope of representation affecting the budget and subject to approval by the board of supervisors and the parties together are unable to agree on a method of resolving the dispute, the dispute *shall* be submitted to mediation.

"(b)  If the parties are unable to agree on the mediator, either party *may* request the service of the state conciliation service to provide a mediator.  Costs of mediation shall be divided one-half (1/2) to the County and one-half (1/2) to the recognized employee organization or recognized employee organizations."  (Our emphasis.)

The County asserts that this ordinance is permissive only.

"Under 'well-settled principle[s] of statutory construction,' we 'ordinarily' construe the word 'may' as permissive and the word 'shall' as mandatory, 'particularly' when a single statute uses both terms.  [Citation.]  In other words, '[w]hen the Legislature has, as here, used both "shall" and "may" in close proximity in a particular context, we may fairly infer the Legislature intended mandatory and discretionary meanings, respectively.'" (*Tarrant Bell Property, LLC v. Superior Court* (2011) 51 Cal.4th 538, 542.)  However, consideration of the legislative history may establish that the Legislature intended "shall" to be permissive.  (*Ibid.*)  The County offers no legislative history to contradict the plain meanings of "shall" and "may" in the quoted ordinance.

The County also argues that this impasse procedure was never triggered, because it reserved the right in section 7.1 (b) of the MOU "to unilaterally adjust the work assignments over the union's objection provided adequate notice and an opportunity to meet and confer are given."  We will next address the significance of this subdivision.

18

**F. THE COUNTY'S RESERVED RIGHT**

In section 7.1 (b) of the MOU, the County, as appointing authority, specifically reserved "the right to convert assignments on the Twelve Plan to either a 5/8 or 4/10 Plan, upon the giving of forty-five (45) calendar days' advance notice of such change to the Association, which shall be afforded the opportunity to meet and confer on such a proposed change prior to its implementation."

**1. The Association did not waive its right to bargain regarding reduced working hours**

The County urges that this subdivision of the MOU amounts to "a management reservation of rights clause that reserves for management the right to implement certain unilateral changes." This clause, the County argues, "is evidence that [the Association] waived its right to bargain the change in work schedules."

*Farrell*, *supra,* 41 Cal.3d 651 discussed the waiver defense at pages 667 and 668. " ' "Courts examine the defense of waiver carefully in order to ensure the protection of a party's rights, especially when these rights are statutorily based." ' ([*Sacramento*], *supra,* 147 Cal.App.3d 482, 488, quoting *Oakland Unified School Dist. v. Public Employment Relations Bd.* (1981) 120 Cal.App.3d 1007, 1011.) Federal courts use two basic tests when considering claims that a union has waived its right to bargain with an employer: some follow the rule that a waiver must be made in 'clear and unmistakable' language [citations], and others look beyond the language of the contract and consider the 'totality of the circumstances' to determine whether there was a waiver of rights [citation]. In California, the 'clear and unmistakable' language test has been preferred in cases involving public employees. (See, e.g., [*Sacramento*], *supra,* 147 Cal.App.3d at p. 488; *Oakland Unified School Dist. v. Public Employment Relations Bd., supra,* 120 Cal.App.3d at p. 1011.)"

The County relies on *Sacramento*, *supra,* 147 Cal.App.3d 482, even though the appellate court found no waiver in that case. In that case, as we have already discussed, a county conceded that a change of shift start times was generally subject to bargaining, but contended that the union "specifically waived its right to meet and confer on this matter

19

in the MOU.  The County relies on article III of the MOU, entitled 'county rights.' Subdivision (b) of that provision states '[t]he rights of the County include, . . . the exclusive right to . . . train, direct and *assign* its employees; . . .' (Italics added.)  The County urges that by this provision it retained the right to unilaterally assign its employees to any shift without first meeting and conferring with the union." (*Id.* at p. 487.)

The *Sacramento* decision applied both tests and found no waiver.  Looking at the totality of the circumstances, a history of unilateral reassignments without a request to meet and confer did not establish a waiver, considering that history also showed that the union had agreed to two of the three shift changes that involved multiple employees. (*Sacramento*, *supra,* 147 Cal.App.3d 482, 488-489.)  The county argued that it requested the "county rights" provision many years earlier "to protect itself from the statutory bargaining requirements." (*Id.* at p. 489.)  The court characterized this as an undisclosed intention at the time and also when the union "signed a subsequent agreement ten years later." (*Ibid.*)  "Nor does the record show that either the practices or mutual intentions of the parties indicated the County's right to 'assign' employees was to be considered a waiver of [the union's] right to meet and confer on the matter." (*Ibid.*)

*Farrell*, *supra,* 41 Cal.3d 651 similarly found no waiver by provisions in an MOU under either test of waiver.  (*Id.* at p. 668.)

As section 7.1 (b) of the MOU specifically recognized the Association's right to meet and confer before implementation of a plan to convert 12 Plan assignments to 5/8 or 4/10 Plan assignments, we do not regard the subdivision as a waiver of the same right. (Cf. *N.L.R.B. v. U.S. Postal Service* (D.C. Cir. 1993) 8 F.3d 832, 836-837  (*U.S. Postal Service*) ["questions of 'waiver' normally do not come into play with respect to subjects already covered by a collective bargaining agreement."].)

### 2.  The MOU specified the applicable time period to meet and confer

The Association complains that the "County failed to provide adequate time to complete the process because it set an arbitrary deadline for completing the meet and confer process."

20

We reiterate that section 3505 provides in part: "'Meet and confer in good faith' means that a public agency, or such representatives as it may designate, and representatives of recognized employee organizations, shall have the mutual obligation personally to meet and confer *promptly* upon request by either party and *continue for a reasonable period of time* in order to exchange freely information, opinions, and proposals, and to endeavor to reach agreement on matters within the scope of representation prior to the adoption by the public agency of its final budget for the ensuing year. *The process should include adequate time for the resolution of impasses* where specific procedures for such resolution are contained in local rule, regulation, or ordinance, or when such procedures are utilized by mutual consent." (Our emphasis.)

The MMBA does not attempt to specify how long or how frequently parties must meet in order to establish prima facie good faith or when impasse may be declared. The parties to an MOU, however, are free to agree in advance on a period of time that they consider reasonable to allow them to freely exchange information and proposals and endeavor to reach agreement. It appears that the parties did so as to this particular topic. Section 7.1 (b) of the MOU states that the County could convert 12 Plan assignments to the 5/8 or 4/10 Plans 45 days after giving written notice and providing the opportunity to meet and confer. The County scheduled implementation of its modification to coincide with its new fiscal year. We conclude that neither the specified 45-day period nor the date was an arbitrary deadline.

The specified time period of 45 days from notice to implementation also contains an unavoidable implication about the applicability of the impasse procedure contained in the County Code. The County Code provides for resolution of impasse by mediation if the parties are unable to agree on another method of resolving their dispute. Here, 45 days was sufficient time to conduct three meetings to discuss the County's proposal and to conduct a vote by Association members. But 45 days is an unrealistically short time to conduct several meetings at which the parties "exchange freely information, opinions, and proposals, and to endeavor to reach agreement" (§ 3505), and also to reach and declare an impasse, agree on a mediator, and participate in mediation. The MOU

21

arguably did not allow an "adequate time for the resolution of impasses where specific procedures for such resolution are contained in local rule, regulation, or ordinance." (§ 3505.) It therefore appears that the parties did not intend the impasse resolution procedure to apply to this particular proposal by the County to convert 12 Plan assignments. Instead they specified the entire applicable process in the MOU, 45 days notice of a County proposal to convert 12 Plan assignments, the opportunity to meet and confer within those 45 days, and implementation of the County's proposal 45 days after providing notice, regardless of whether the parties reach agreement or impasse on implementation in the interim. Though we have concluded that the Association did not waive the right to bargain about the implementation of converting the 12 Plan to other plans, we conclude that the Association did waive any right to postpone implementation beyond 45 days by declaring impasse and compelling mediation.

### 3. The reserved right to reassign all 12 Plan employees included the right to reduce the 12 Plan shifts

We recognize that the County sought to achieve budget savings through reduced work schedules rather than employee layoffs. Nonetheless, we find guidance regarding the County's obligation to meet and confer from cases involving layoffs.

The California Supreme Court has clarified its earlier ruling in *Vallejo* regarding the extent to which contemplated layoffs of public employees are negotiable. Looking at cases involving private employers, the court noted: "[F]ederal courts have held that bargaining is required when the layoffs result from an employer's decision to reassign bargaining unit work to independent contractors or to managers. [Citations.] On the other hand, federal courts do not require bargaining when layoffs result from profitability considerations that are independent of labor costs [citation], or from a management decision to shut down all or part of a business [citation]. When layoffs are motivated primarily by a desire to reduce labor cost, but are not the result of a decision to change the nature or scope of the enterprise, and do not involve reassigning bargaining unit work to non-bargaining-unit workers, federal courts require bargaining over the timing of the layoffs and the number and identity of the affected employees, but not necessarily over

22

the layoff decision itself. [Citations.] The United States Supreme Court has said that a conflict resulting from an employer's desire to reduce labor costs is 'peculiarly suitable for resolution within the collective bargaining framework' under the NLRA. (*Fibreboard Paper Products Corp. v. National Labor Relations Board* (1964) 379 U.S. 203, 214.)" (*Local 188*, *supra,* 51 Cal.4th 259, 272.)

Adapting these private employment cases to public employment, the court explained that "the rule adopted in *Vallejo* is that under the MMBA a local public entity may unilaterally decide that financial necessity requires some employee layoffs, although the entity must bargain over the implementation of that decision and its effects on the remaining employees." (*Local 188*, *supra,* 51 Cal.4th 259, 276; cf. *State Assn. of Real Property Agents v. State Personnel Bd.* (1978) 83 Cal.App.3d 206, 213 ["federal cases have uniformly held that an employer faced with economic necessity has the right unilaterally to decide that some reduction in work forces must be made."].) "Under the MMBA, a local public entity that is faced with a decline in revenues or other financial adversity may unilaterally decide to lay off some of its employees to reduce its labor costs. In this situation, a public employer must, however, give its employees an opportunity to bargain over the implementation of the decision, including the number of employees to be laid off, and the timing of the layoffs, as well as the effects of the layoffs on the workload and safety of the remaining employees." (*Local 188*, *supra,* 51 Cal.4th at p. 277.) The Supreme Court held that "when a city, faced with a budget deficit, decides that some firefighters must be laid off as a cost-saving measure, the city is not required to meet and confer with the firefighters' authorized employee representative before making that initial decision." (*Id.* at pp. 264-265; cf. *Engineers & Architects Assn. v. Community Development Dept.* (1994) 30 Cal.App.4th 644, 656 [the "decision to lay off employees because of lack of funds or lack of work" is "an exclusive management right."].)

*Local 188* defines the scope of the exclusion in section 3504 from bargaining of the "merits, *necessity* or organization of any service or activity." (Our emphasis.) This "necessity" is not the kind of business necessity or financial emergency that merely

23

postpones the obligation to meet and confer. Instead, it identifies the kind of decision that is exempt from collective bargaining altogether because it is inherently within managerial policy and prerogative.

In a different context, it has been established that the "integrated process of determining the budget of a county and adjusting the number of employees in each county office to conform to the overall spending plan is a legislative function which 'may not be controlled by the courts.'" (*County of Butte v. Superior Court* (1985) 176 Cal.App.3d 693, 698.) "The power and obligation to enact a county's budget is vested by law in the board of supervisors. (Gov. Code, § 29088.) Furthermore, the board of supervisors is responsible for fixing the number of employees of each county office, their compensation, and other conditions of employment. (Cal. Const. art. XI, § 4, subd. (f), Gov. Code, § 25300.)" (*Ibid.*) This language, though not arising in the labor context, suggests what must be considered as management's prerogative.

Applying the reasoning of *Local 188* to our case, how much the County can afford to spend on staffing its jails, in other words, the budget for the DOC, is inherently within fundamental managerial policy and prerogative, even without an explicit reservation of managerial rights. Deciding how to accomplish a budget target, namely, by layoffs, is also within management prerogative. If a county decides to preserve jobs and find ways other than layoffs to trim the budget of a department, that would also be within managerial prerogative.

We conclude that the County was not required by the MMBA or the MOU to meet and confer about the need to reduce the budget of the DOC or about the policy decision to avoid layoffs in making reductions. Retaining all existing employees while paying them less necessarily requires either reducing their hours or their compensation, both bargainable under the MMBA. Although under section 7.1 (b) of the MOU the County was required to meet and confer before exercising its right to convert 12 Plan employees to other plans, the scope of those negotiations was limited to details of *implementing* such a change.

24

The Association contends it never agreed to the County's decision to adopt the modified 12 Plan. This contention challenges the trial court's finding that "because [the Association's] members chose the modified 12 Plan over the other proposed schedules, . . . there was mutual agreement and, therefore the parties did not need to declare impasse and mediation was not required." The Association argues that its email report of the members' vote reflected a preference for one type of implementation over another, but "does not show mutual agreement to the *decision*" to adopt the plan. The County counters that the email was intentionally self-contradictory and that substantial evidence supports the trial court's interpretation. While we agree with the Association that the reported vote does not reflect its consent to the County's proposal to modify the 12 Plan, we disagree with the underlying premise that the Association's consent was required.

The County had reserved the right in the MOU to convert all 12 Plan employees to other listed plans upon 45 days notice and the opportunity to meet and confer before implementation. In other words, the Association had already consented to a conversion on these terms. The Association had the right to meet and confer about how the conversion would be implemented, such as the timing of the conversion, but not about whether it would be implemented. The Association did not have the right to delay implementation beyond 45 days by declaring impasse and requesting mediation.

It is evident that the County contemplated in section 7.1 (b) of the MOU that at some future time it might lose the financial ability to maintain a number of employees working 85.75 hours biweekly instead of 80 hours biweekly. The reservation of rights did not eliminate the County's obligation to meet and confer about reassigning all 12 Plan employees to shorter work weeks, but it was apparently adopted in contemplation of circumstances possibly requiring elimination of the 12 Plan.

The trial court noted that the County did not actually exercise its right to convert all 12 Plan employees to other listed plans. The Association likewise emphasizes that "[s]ection 7.1(b) only permits a 5/8 or 4/10 Plan, not the Modified 12 Plan" and that "section 7.1(b) does not authorize 12-hour shifts." We agree that section 7.1 (b) did not explicitly authorize the County to offer alternatives to converting 12 Plan employees to

25

either the 4/10 or 5/8 Plans. However, it is a maxim of jurisprudence that "[t]he greater contains the less." (Civ. Code, § 3536.) As the County was able to assign all 12 Plan employees to 40 hour work weeks and 80 hours biweekly on one of two other plans, it is implicit that the County could offer 12 Plan employees other formulas for working 80 hours biweekly.

The appellate court in *Uforma/Shelby Business Forms, Inc. v. N.L.R.B.* (6th Cir. 1997) 111 F.3d 1284, cited by neither side, applied similar reasoning. At issue in that case was whether a private employer "had the right to abolish the third shift, reschedule twelve employees to different shifts, and lay off five other employees without first providing notice and opportunity to bargain." (*Id.* at p. 1290.) The NLRB had found a violation of the employer's obligation to meet and confer. The appellate court disagreed, looking at the rights reserved to management ("petitioner") in the collective bargaining agreement.

"Although the language does not state that petitioner may 'eliminate a shift,' it reserves to petitioner the exclusive ability to schedule and assign work, determine the number of employees required for a job, and layoff or relieve employees from duties. These broad powers necessarily encompass the ability to reschedule and lay off the members of a given shift, regardless of whether petitioner is affecting one or one hundred employees. The reasoning of the ALJ exalts form over substance by suggesting that collective bargaining agreements must catalog every conceivable permutation of a decision to lay off, such as delineating with precision each position or work force percentage which an employer may reschedule or lay off." (*Uforma/Shelby Business Forms, Inc.*, *supra,* 111 F.3d 1284, 1290.)

While the reserved management rights in our case were not as broad as those in *Uforma/Shelby Business Forms, Inc.*, they did contemplate the County converting 12 Plan employees to working 80 hours biweekly after allowing the Association to meet and confer about the implementation of this conversion. We conclude that the power to eliminate all 12 Plan assignments and the power to lay off employees for budgetary reasons must include the ability to modify 12 Plan assignments to conform to other work

26

schedules recognized in the MOU. The County was acting within its reserved rights by preserving most of the 12 Plan schedule, rather than reassigning all or most 12 Plan employees to other plans. The County recognized an obligation to meet and confer before exercising this reserved right, and the record reflects that it complied with that obligation.

### 4. Bargaining in good faith

The County repeatedly asserts that the Association engaged in bad faith bargaining, apparently in response to its perception that the Association has accused the County of bad faith bargaining. The Association's briefs do not expressly accuse the County of bargaining in bad faith, but they complain that the County failed to complete its obligation to bargain in good faith and imposed an arbitrary deadline. We have already rejected those contentions, which we understand to be the Association's only implicit claims of bad faith by the County.

We do not agree with the trial court's finding that the Association's membership vote preferring one form of a modified 12 Plan over another established the County's good faith in bargaining. As we have explained, however, modifying the 12 Plan was within the County's reserved rights so long as it met and conferred regarding the implementation. The record establishes that there were three meetings at which the Association was afforded an opportunity to discuss implementation.

"In general, good faith is a subjective attitude and requires a genuine desire to reach agreement [citations]. The parties must make a serious attempt to resolve differences and reach a common ground [citation]. The effort required is inconsistent with a 'predetermined resolve not to budge from an initial position.' [Citations.]" (*Placentia*, *supra,* 57 Cal.App.3d 9, 25-26.) However, adamantly insisting on a position does not necessarily establish bad faith. (*Public Employees Assn. v. Board of Supervisors* (1985) 167 Cal.App.3d 797, 805-806.)

To the extent the Association implies the County acted in bad faith, the implication is based on the premise that the County was required to engage in further meetings and then participate in mediation if an impasse was reached. As we have

27

concluded that the County acted within the authority reserved in section 7.1 (b) of the MOU, we reject the implication that the County's action was taken in bad faith.

## IV. DISPOSITION

The judgment is affirmed.

_____
Grover, J.

**WE CONCUR:**

_____
Rushing, P.J.

_____
Elia, J.

28

| | |
|---|---|
| Trial Court: | Santa Clara County Superior Court<br>Superior Court No. 1-11-CV-205583 |
| Trial Judge: | Hon. Carrie A. Zepeda-Madrid |
| Counsel for Plaintiff/Appellant Santa Clara County Peace Officers' Association, Inc.: | David P. Mastagni<br>Kathleen N. Mastagni<br>Jeffrey Edwards<br>Mastagni, Holstedt, Amick, Miller & Johnsen |
| Counsel for Defendant/Respondent County of Santa Clara: | Cheryl Stevens<br>Deputy County Counsel<br>County of Santa Clara |

***Santa Clara County Correctional Peace Officers' Association, Inc. v County of Santa Clara***
**H037418**